## VICTOR TALKING MACH. CO. v. STARR PIANO CO.*

(Circuit Court of Appeals, Second Circuit. April 4, 1922.)

No. 200.

1. **Patents ⊗➔328—896,059, for disk sound record for talking machines, held void for lack of invention and for abandonment.**
   The Johnson patent, No. 896,059, for disk sound record for talking machines, claims 6 and 8, *held* void for lack of invention and also for abandonment.

2. **Patents ⊗➔83—Keeping invention secret for years constitutes "abandonment."**
   The keeping of a process secret for years by the inventor constitutes abandonment under the patent laws.
   [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Abandon—Abandonment.]

3. **Patents ⊗➔325—Expenditures for necessary exhibits held taxable as costs.**
   Expenditures made for motion pictures and photographs of cutting tools in operation and of the grooves made by these tools, where both tools and grooves were microscopic, and the pictures were necessary to enable the court to understand the processes involved, *held* taxable as costs.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in equity by the Victor Talking Machine Company against the Starr Piano Company. Decree for defendant, and complainant appeals. Affirmed.

Appeal by the plaintiff from a decree of the United States District Court for the Southern District of New York, dismissing the bill of complaint for lack of invention and for abandonment.

The suit was to restrain alleged infringement of United States letters patent No. 896,059, granted August 11, 1908, to Eldridge R. Johnson. The specification states:

"My invention relates to improvements in sound records of either the cylindrical or disk type, and has for its object to provide an improved record such that the walls of the grooves shall be so formed as to reproduce the sounds of the record in tones more clear and distinct than has heretofore been possible from records of prior construction.

"In forming records upon sound recording machines for use in talking machines, such as the gramophone, where the sound waves are recorded in the form of a groove of even depth having lateral undulations as distinguished from an undulatory groove of varying depth, as in the type of machines of which the phonograph is an illustration, it is essential, in order to produce a clear record, that the material be neatly and cleanly cut from the grooves in the process of recording so that smooth, well-defined surfaces be formed in the walls of a well-defined groove.

"In the art of making sound records comparatively little attention has been paid to the finishing and the forming of the surfaces of the walls of the record groove. The vertical groove has heretofore been cut by a recording tool, which, owing to the character of the groove and the shape of the tool, has not only had a tendency to tear the material of the record, or distort the same, so as to form roughnesses which, in the reproduction of the record or its duplicate, cause disagreeable sounds, owing to the harsh vibrations of the diaphragm caused thereby, but also, among other things, in the vertical type of record, the resistance on the cutting stylus in gouging out the material increases in proportion to the depth, which objection is overcome in my cut laterally undulating record groove, where the resistance to the force exerted by the cutting stylus is uniform and even.

"I have discovered by careful experiments that the best results are obtained in a cut-out laterally undulatory groove of substantially constant depth in a record tablet, preferably of wax or other suitable material, and furthermore, when the walls of the groove diverge from the bottom of the same to the surface of the record, or, more specifically, when the walls of the groove are formed by surfaces which in cross section give the lines of a segment of an ellipse, the groove being widest at its mouth, and gradually diminishing in its width toward the bottom. By this construction, the material is neatly and accurately cut out, and forms a groove having smooth and well-defined walls. The recording needle has greater freedom of oscillation, and by reason of the relative contour of the walls of the groove with the outline of the needle this construction prevents any binding effect and secures a maximum ease of movement of the needle with a minimum of wear upon the record. * * *

"It is understood that in reproducing, the record thus formed may be used for reproducing purposes directly, or a more durable and indestructible record may be reproduced by various processes from the original record. * * *"

The claims relied upon are the following:

"6. A disk sound record having a laterally undulatory groove of substantially constant depth in which the record groove was formed by cutting out and removing the material in forming the record grooves, the walls of the said groove diverging from the bottom of the same to the surface of the record tablet.

"8. A disk sound record comprising a spirally disposed laterally undulatory groove of substantially constant depth in which the record groove was formed by cutting out and removing the material in forming the record groove, substantially as described."

The defenses were lack of invention, anticipation, and abandonment.

A preliminary injunction was denied in the District Court and also on appeal by this court, 263 Fed. 82.

Kenyon & Kenyon, of New York City (William Houston Kenyon and Richard Eyre, both of New York City, John D. Myers, and George T. Bean, both of Camden, N. J., and Edgar F. Baumgartner, of New York City, of counsel), for appellant.

Kerr, Page, Cooper & Hayward, of New York City (Parker W. Page, Drury W. Cooper, and Thomas J. Byrne, all of New York City, of counsel), for appellee.

Before ROGERS, Circuit Judge and AUGUSTUS N. HAND and KNOX, District Judges.

AUGUSTUS N. HAND, District Judge (after stating the facts as above). [1] The invention claimed in the patent in suit and expressed in the two claims in issue is defined by complainant's counsel as embodying: (1) A master record, (2) in disk form, (3) with spiral laterally undulating sound record groove of the gramophone type, i. e., of microscopic size and of uniform depth and trench-like for piloting as well as for sound-reproducing purposes, (4) the groove being formed by the direct action of sound waves, (5) in wax or wax-like material, (6) cut out and the material of the groove removed (7) in such way that it becomes and is a well-defined groove of uniform size throughout having continuously smooth, well-defined side walls, both of the smooth side walls contributing by their lateral undulations an accurate reproduction of the composite sound wave being recorded, (8) the groove being everywhere and uniformly diverging (this last limitation appearing in claim 6, and not in claim 8).

The patent in suit came from a division in the Patent Office. The original application was stated to relate to an invention for improvements in cutting tools for sound recording machines. It was filed August 16, 1898, and finally resulted in patent No. 778,975. The original specification nowhere claimed any invention for laterally cutting a wax tablet for use as a matrix or for direct reproduction. Indeed it said:

"In practice in the production of a record a thin metal plate may be employed upon which is evenly distributed a coating or layer of semiplastic material or partly hardened varnish, or other suitable material. * * *

"I have herein referred briefly to the class of machine to which my invention is particularly applicable, so that the cutting operations may be understood, but, as the cutting tool alone is the subject of my present invention, I have not deemed it necessary to herein illustrate, or further describe, the construction of machine to which it may be applied. * * *

"The object of my present invention is to provide a cutting tool for cutting grooves in wax or other suitable material for recording sound waves. * * *"

The only suggestion in the original specification of a wax matrix capable of direct reproduction is in the following:

"It is understood that in reproducing the record thus formed may be used for reproducing purposes directly, or a more durable and indestructible record may be reproduced by various processes from the original record. This feature, however, forms no part of my present invention herein described."

A wax matrix for reproduction was not only not claimed as an invention, but manifestly the process first described referred to the sort of process already in use by Berliner carried out with an improved kind of tool. In the Berliner process a metal plate was coated with lampblack or other material on which was traced a laterally undulatory record to expose the surface of the disk, which was then etched to form the record groove. Even though cutting out a wax tablet was contemplated, the reference was incidental, and was not claimed as an invention even when the divisional application was filed in 1904. The claims of 1904 related to the shape of the laterally formed groove. Even then Johnson apparently regarded everything else as old.

Difficulties had been encountered in making satisfactory records by the etching process of Berliner, and in December, 1897, Johnson was employed by the Berliner Company to devise a "new system of taking gramophone records and making matrices" that would "give * * * better results." Nafey worked for Johnson in 1898, and left about September of that year. He was succeeded by Rhinehart, who was asked whether he said to a man named Pancoast that Johnson's apparatus was a failure before Rhinehart came. To this he replied:

"Well I may have said it looked like a failure, or something like that. A. man would say offhand, you know, when a man is on his oath and is supposed to tell the truth, that he will tell things as straight as he can. If you are just talking to a man ordinarily, you are not so particular whether it is absolutely straight or not. It is more like a story."

Now, whatever preliminary steps Johnson may have made, it was not until 1900, just before Turner came to England, that the process was completed. As Royal, the secretary of the Victor Talking Machine Company, said in his affidavit in 1901: "We never used the first process purchased in 1898." To be sure, Royal testified at the trial of the

present suit that his statement was not intended to apply to the cutting out of a lateral groove in wax, but the testimony of Johnson and his witnesses is insufficient to meet the burden Johnson has in order to overturn the application of Jones filed November 18, 1897, nine months prior to the filing date of the patent in suit. The Jones patent, No. 688,739, related to the commercial production of sound records, and had for its object the production of—

"a number of copies of an original record characterized by lateral undulations of substantially uniform depth. Heretofore records of this character, generally known as 'gramophone records,' have been produced by first tracing the lateral undulations or zigzags in a fatty (inky) film that protects an etching surface, then etching this tracing into the material to form a groove, then running a blunt stylus through this groove to smooth the ragged etched surface, and finally electroplating this touched-up surface and pressing the matrix so formed into a suitable material to form the commercial record. The etching process, for reasons unnecessary to state, causes considerable departure or deviations, so that the etched groove is far from being a correct representation of the path of the recording stylus. The deformations from this cause are still further exaggerated by the use of the smoothing stylus. I avoid these objections by producing in the first instance a fully finished original record whose grooves are of the final depth required, slight, but appreciable, thus doing away with the necessity for etching and the subsequent smoothing made necessary thereby. The original records made by this process are electroplated, and the electroplate matrix used as a die in the ordinary manner.

"In carrying out my invention I employ a disk or tablet, of suitable recording material (as wax or wax-like composition, preferably rendered sufficiently hard, as by an admixture of rosin, to withstand the treatment employed in giving it an electrical conducting surface). Upon the surface of this tablet I then form by the use of a sound-recording machine in a well-known manner a spiral groove of practically uniform depth that contains lateral sinuosities or irregularities corresponding to or representing the sound waves recorded. This cutting or engraving of a record groove by the lateral movement of the stylus differs from the operation of the well-known graphophone system in that the resistance offered the stylus of a gramophone in cutting downward to produce the vertical irregularities characteristic of that system varies practically as the cube of the length of the vibrations of the diaphragm and stylus, whereas in producing any original records the resistance encountered by recording stylus is exactly equal to the length of the vibrations. On account of this difference in principle I am enabled to obtain more accurate, and therefore better, records of the original sounds. The original record so formed is an exact copy of the record to be used for reproducing. It is a complete and finished record, its grooves being of a slight yet appreciable depth, and no deepening or retouching by an etching fluid or in any other manner is required. * * *"

The specification (page 2, line 50) of the patent in suit states:

"It is understood that in reproducing the record thus formed may be used for reproducing purposes directly, or a more durable and indestructible record may be reproduced by various processes from the original record."

It was contended by complainant's counsel that Jones did not intend to employ a cutting out process from a wax record because the word "cutting" was injected into his specification two or three years after the original application was filed in the Patent Office. He did, however, use the word "engraved," and in his specification as originally filed said:

"I first make a plate or disk of hard wax, preferably beeswax hardened by the adding of a small quantity of rosin or pitch.

"This plate or disk is then placed upon an instrument commonly employed

·for the purpose of recording sound vibrations, and a helical groove of even depth containing sinuosities representing sound waves produced by the movement of the diaphragm and stylus is engraved upon the plate or disk."

We think it evident that this was a cutting-out process within the meaning of the art and the words used in the Johnson specification and claims.

The Jones patent seems to disclose the same process as the patent in suit and to include the process for making a sound record cut out of a wax tablet described in claims 6 and 8 in issue. Indeed, Johnson himself admitted in a former litigation that he could see no difference between the Jones process and his. Judge Mayer held in American Graphophone Co. v. Emerson Phonograph Co. (D. C.) 255 Fed. 574, that the patent in suit did not anticipate the Jones patent.

It is a significant fact that Johnson controlled the Universal Talking Machine Manufacturing Company, which was the defendant in the suit of American Graphophone Co. v. Universal Talking Machine Manufacturing Co., 151 Fed. 595, 81 C. C. A. 139, brought for infringement of the Jones patent, and that it was never contended in that case that the invention of the patent in suit was prior art or anticipated the Jones patent. It was not until after the Jones patent was sustained by this court in the litigation last mentioned that Johnson attempted in his divisional application to expand his claims by employing the words "cutting out and removing the material forming the record groove," and we think that the fact that such a·method was disclosed by the Jones process cannot be reasonably doubted. Anything that remained to be done to perfect the mechanism commercially was a matter of shop practice which skilled operatives could work out by careful experiments, and was not developed beyond the disclosure of the Jones patent by any improvement which Johnson has set forth. It is not uncommon for inventors to seek to interpret an old application in such a way as to cover an expanding art, but it is legally of no avail. American Graphophone Co. v. Emerson Phonograph Co. (D. C.) 255 Fed. 574.

In the Edison British patent to Couraud, No. 15,206, 1891, the specification says, at page 4:

"The recording surface of the phonogram blank is ordinarily made of wax or wax-like material, and it might be supposed that a steel tool of the best quality would be satisfactory for employment in connection ·with such a comparatively soft substance. It has, however, been found that such tools are liable to become rough. This is partly due to the chemical action of acids or other substances present in the wax or wax-like composition, of which the phonogram blank is made, and partly to the dulling and roughening action of the fine particles of silica or other hard material which get accidentally mixed with the wax during its manufacture into a blank, or which lodge on the surface of the blank itself. After many trials, it has been discovered that sapphires and similar jewels act in the most effective manner on the wax or wax-like phonogram blank, since the acids thereof do not attack them; they do not rust;. and they are able to withstand the dulling action of the hard particles of silica or other substances. ·

"A jewel-cutting tool suitable for the recorder may be in the shape of a cylinder, the outer end being hollowed out; this leaving a curved sharp edge for cutting the surface of the blank. This particular form is, however, not essential. It is mounted in a socket or sleeve at one end of a pivoted lever, the opposite end of which is connected to the diaphragm. * * *

"The recorders hitherto used are moved by the diaphragm toward and away from the surface of the blank. An improved form of recorder, in which the recording point moves laterally in a succession of minute arcs, has, however, been devised."

The specification further says, at page 11:

"Vibrations are more truly recorded in this manner than by indenting the blank in the usual way; the reproduced sounds being accordingly improved."

The foregoing patent clearly covers cutting from a wax tablet. The Bell and Tainter patent, No. 341,214, granted May 4, 1886, also seems to have disclosed lateral cutting. The specification reads (page 1, line 16):

"The invention consists thirdly in cutting or engraving the record in the form of a groove with sloping walls, the sound waves being represented by elevations and depressions at the bottom of the groove or otherwise. The advantage of this form of record is that it forms an efficient guide to the reproducing style."

The Volta article describing the work of Bell and Tainter, which became public in 1896, clearly shows that they were familiar with lateral cutting. Indeed, the closeness of the reference of the Bell and Tainter patent to the patent in suit is further indicated by the statement of Bell and Tainter, at page 2, line 4, of their patent, that:

"The invention consists, fifthly, in reproducing directly from the wax record. It is found that such record has sufficient strength to withstand the rubbing action of the reproducing style, so that a considerable number of reproductions can be obtained from it. The smoothness of the wax gives it a great advantage in this regard. So far as we are aware, no one has reproduced sound from a wax record by rubbing a style or reproducer over it."

In view of the foregoing language and general scope of the Bell and Tainter patent, we think it reasonable to infer, as Judge Learned Hand did in the court below, that this court in the case of American Graphophone Co. v. Universal Talking Machine Co., supra, sustained the Jones patent over the Bell and Tainter patent because of the novelty and usefulness of the combination of the former, and not because any single element thereof was patentable.

Johnson admitted in his examination that the particular difference between the tool described in Figures 5 and 6 of the Bell and Tainter patent, No. 341,214, is that the Johnson tool had sharper lateral edges. The most that can be said of the Johnson patent in suit is that it disclosed a method of cutting out a lateral undulatory groove of substantially constant depth by an improved form of stylus. Everything except the improved tool which his specification discloses seems to have been old, and the improved tool was apparently a matter of workmanship, and at any rate is not an element in the claims in suit.

The master record in disk form, with a spiral laterally undulating groove of uniform depth, cut in wax, which plaintiff claims as his invention, was directly foreshadowed by Bell and Tainter, Gouraud, and Jones. Nothing remained but work for skilled artisans in order to fabricate a satisfactory sound record. Nothing was achieved worthy of a patent in producing the Johnson matrix.

The plaintiff seeks to save the Johnson patent by the large commer-

cial success of the process employed, but commercial success has already been found by this very court to be attributable to the Jones patent, of which plaintiff was a licensee. American Graphophone Co. v. Universal Talking Machine Co., 151 Fed. 595, 81 C. C. A. 139. Success cannot be attributable to both patents substantially involving the same process. We think it clear that the patent in suit is void for lack of invention. It seems evident that Johnson invented nothing new in the way of a matrix laterally cut out of wax, and that he did not think that he had done so. He, at most, by more experienced workmanship, produced better results through methods that were undoubtedly old than had formerly been secured.

[2] The only reason offered to meet the contention that the invention, if ever made, was abandoned, is that plaintiff's counsel until after the decision in American Graphophone Co. v. Universal Talking Machine Co., supra, in which the Jones patent was sustained, advised defendant that the invention for lateral cutting out of wax was invalid under the Bell and Tainter patent, No. 341,214. Under this advice, Johnson for years relied upon keeping his process secret. Such conduct was a clear abandonment under the decisions. Kendall v. Winsor, 21 How. 322, 16 L. Ed. 165; United States Rifle & Cartridge Co. v. Whitney Ames Co., 118 U. S. 22, 6 Sup. Ct. 950, 30 L. Ed. 53; Macbeth-Evans Glass Co. v. General Electric Co., 246 Fed. 695, 158 °C. C. A. 651.

[3] Objection is made to the allowance of $841.64 taxed as costs by the defendant for motion pictures and photographs of cutting tools in operation, and of the grooves made by these tools. It is contended by plaintiff's counsel that these items are not allowable under such decisions as Wooster v. Handy (C. C.) 23 Fed. at pages 61, 62; Cornelly v. Markwald (C. C.) 24 Fed. 187; Hussey v. Bradley, Fed. Cas. No. 6946a. In these cases expenditures for models made and used at the trial and for photo-lithographing sketches introduced by witnesses in giving their evidence were disallowed. They were treated as expenditures relating to argumentative matters, and not to physical exhibits bearing a direct relation to the patent in suit or infringement thereof, such as photographs of models deposited in the Patent Office or of infringing devices. In this case, however, it was practically impossible for the trial court to get a visual idea of the operation of cutting tools and of the character of the grooves formed by them without illustration and enlargement in the way adopted. Both the tools and the grooves were of miscroscopic proportions, so that the situation, while not without some resemblance to that of models in other cases, should be differentiated because illustration here was necessary to enable the trial court to understand the processes and to make a proper record for review in this court. Much abuse can arise from too free a taxation of such items of costs as are here under consideration, and it would be better practice to obtain an order of the trial court before incurrin the expense, but in this particular case the expenditure seems to h been justified. The S. V. Luckenbach, 197 Fed. 888, 117 C. C. A. ⹀

The decree is affirmed, with costs.