## APPLIANCE INV. CO. v. WESTERN ELECTRIC CO., Inc.

### No. 12.

Circuit Court of Appeals, Second Circuit.

Nov. 7, 1932.

Henry J. Lucke, of New York City (G. Dexter Blount and Harry S. Silverstein, both of Denver, Colo., and Frank Toohey, of counsel), for plaintiff-appellant.

Charles Neave, of New York City (Merrell E. Clark, F. T. Woodward, and H. A. Pattison, all of New York City, of counsel), for defendant-appellee.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

The plaintiff is the owner by assignment of United States patent No. 1,318,670, issued October 14, 1919, to Horace Hull, for selective signaling apparatus. It alleged in the bill of complaint that this patent had been infringed by the defendant's selective signaling apparatus, and the proof centered upon the defendant's train dispatching system as the offender.

Hull made three applications for a patent. The first, dated January 11, 1912, and the second, dated August 26, 1912, were both formally abandoned in favor of his application, dated June 25, 1914, on which the patent was issued.

As Hull stated in his specifications, his "invention embodies, among other features, a selective signaling system having a plurality of signaling stations connected in multiple with a main electric circuit and employing alternating current as the electric energy for operating the selecting apparatus of the system." What may perhaps be justly called the main, though not the exclusive, purpose of Hull's work, was to provide for use on a telephone party line a way for any station on that line to call any other on the same line without operating the signals at additional stations on the line and without the use of direct current in so doing. An additional important feature was the station lockout, which prevented any one at a station, other than the one called, listening to the conversation. This lockout effect was obtained by having all stations normally disconnected from the main line. Only when the signal giving station was used to send a signal was it connected through the process of sending the signal, while only at the desired receiving station was the main line connected for talking by taking the ear piece off its holder after the signal had been received. When the main line had once been so put in use, other stations were blocked off until it was cleared after the conversation was ended.

The result was not new, as will appear from a study of the Benson British patent No. 4740 of 1882 and United States patent No. 1,013,412, issued to Marchand January 2, 1912. But Hull simplified the method, since, by using alternating current in the signal selector, he was able to use a somewhat less complicated layout and to avoid poling the line, so that repairs after line breakdowns could be made much easier, because the care required to avoid disturbing the poling of the line was eliminated. While Marchand used alternating current impulses to actuate the selectors at the receiving station, this current was obtained, by using pole changers, from the direct current supplied by his generator. Moreover, a signaling system of Edward E. Kleinschmidt, which was in use in the train dispatching service of the Baltimore and Ohio Railroad in 1911, serves to keep the Hull patent from being given the status of a pioneer. For present purposes nothing is to be gained by discussing the state of the prior art in detail. The patent in suit appears to have such novel features in its use of alternating current for signaling that the claims relied on should be treated as valid for the purpose of testing the proof of infringement in this case.

The claims relied on are 3, 4, 6, 7, 8, and 9, and fall naturally into two groups. The first group includes claims 3, 4, 6, and 7, and all relate to intercall signals, with each station having both a sending signal selector and a receiving signal selector. They read as follows:

"3. In a telephone system, a main circuit, a plurality of stations connected in multiple therewith, means at each station to receive a predetermined number of cycles of alternating current to call said station, and means at each station for passing over the circuit a current of proper number of cycles to operate the receiving mechanism of the desired station.

"4. In a telephone system, a main circuit, a plurality of stations connected in multiple therewith, means at each station to re-

ceive a predetermined number of cycles of alternating current to call said station, means at each station for generating an alternating current passed through the main circuit."

"6. In a telephone system, a main circuit, a plurality of stations connected in multiple with said circuit, and each adapted to be operated by a predetermined number of cycles of alternating current, and means at each station for controlling the number of cycles of alternating current sent out by said station for the purpose of calling any one of the desired stations.

"7. In a telephone system, a main circuit, a plurality of stations connected in multiple therewith, mechanism at each station operated by a predetermined number of cycles of alternating current and means at each station for sending over the circuit the necessary cycles of alternating current to operate the mechanism of any of the desired stations.

"8. In a signaling system, the combination with the main circuit, a sending station and a receiving station, of a selector for the sending station including a sending mechanism, impedance coils and controlling devices therefor, a selector for the receiving station including a receiving mechanism, impedance coils and controlling devices therefor, and a source of alternating current adapted to energize the coils at the sending station to impart a predetermined number of movements to the controlling device of the sending mechanism to operate the latter and correspondingly actuate the controlling devices of the receiving mechanism at the receiving station.

"9. In a selecting apparatus for signaling systems, a sending mechanism including a switch adapted to open and close an alternating current circuit, devices including impedance coils for operating the switch to open the circuit at predetermined times, and means for energizing said coils when the alternating current circuit is closed to operate the switch."

The second group of claims, 8 and 9, relate primarily to the sending selector, and are not limited either to having a receiving selector at the sending station or a sending selector at the receiving station. A sending and a receiving station are enough.

In the Hull system, as applied to a telephone line, there is at each subscriber's station, in addition to the apparatus which makes possible the reception and transmission of telephonic conversation with which the claims in suit are not concerned, a bell which will ring when the electric circuit leading to it is closed. When this bell has been rung,

the signal has been given, and, as soon as the ear piece of the telephone has been lifted from its rest, the purely telephonic function of the instrument comes into play by connecting with the same main line over which the alternating current impulses have come to work the signal receiving selector. The selector at the sending station is fitted with a lever to be operated manually to set the sending selector in position to permit the call of the desired station and no other to go out over the line. Each station has a predetermined call number which differs in the number of impulses necessary to be sent out from the sending station to close the bell ringing circuit at the receiving station. The current that rings the bell comes from a battery located at each station, and this same battery furnishes the current for the telephone circuit. Instead of having every impulse from any station close the circuit leading to each signal bell so that all will ring, the sending selector is preset with a hand lever at the number of the desired receiving selector; then an unlimited supply of alternating current impulses from a hand-cranked generator is made to flow into the sending selector. This selector is so contrived that, when the exact number of impulses required to close the bell circuit at the wanted station have been let through to the main line, the sending selector will cut off the excess. Hull's way of doing this will be more fully set forth in considering claims 8 and 9, which relate especially to that phase of his invention.

The defendant's train dispatching system, which is claimed to infringe the patent in suit, likewise has a multiple station line. Such signals as are used also go out over the same main line that is used for conversation. However, every station is permanently bridged across the main line. This means that every station will receive every conversation over the line if one cares to listen in. Moreover, no station is equipped with both a sending and a receiving selector. There are the train dispatcher's station, which has only the sending selector and no receiving selector, and all the other stations which have receiving selectors but no sending selectors. A good way to understand this part of the system is to consider the train dispatcher's station as the central and all others as way stations dependent upon it for sure intercommunication. If by chance any way station operator should talk from his telephone when the operator at some other way station is using the line, he would break into the conversation, and, if one of the persons talking happens to be the one to whom he wants to

speak, he can get his attention. Otherwise, a way station operator, in order to get another, must first speak to the central station and request it to call the station wanted. As soon as the operator at the called station comes on the line, the way stations can converse with each other. To get this service, a way station has but to speak to the central station where an operator is on duty constantly to hear everything said on the line. Consequently, the voice alone over the telephone system suffices to call the central control station; no bell-signaling system is needed at any way station for that purpose, and so none is present. For the same reason no receiving signal selector is needed or present at the central station.

Since the intercall feature of the patent is an integral part of each of claims 3, 4, 6, and 7, none of these claims are infringed by the defendant's system which is not shown to have any intercall signaling means, since no stations can both send and receive signals.

The plaintiff has alluded in its brief to what it has called the defendant's intercall system, but, if there is such a thing, the proof fails to show what it is. When Mr. Hull testified, some vague reference was made to it, and in a booklet of the defendant's, which is a part of the record, selector keys known as 61A and 61B are listed with the statement, "Also used on intercall circuits," but what sort of intercall circuits they are remains undisclosed.

Claims 8 and 9 are not restricted to an intercall system. The signal selection they cover requires more detailed examination in connection with that of the defendant to determine whether they have been infringed. When the operator desiring to send a signal has pulled the lever to the position indicated as the call number of the station to be called, he simply cranks the generator. The lever goes back to its original position while the generator is being cranked, and, when the return is completed, the circuit is closed to prevent more impulses going through. During the return of the lever, exactly the right number of alternating impulses have gone out over the line to ring the bell at the desired station and at none other. Hull returns the lever to open circuit position with a spring which is wound when the lever is pulled to set the selector for a station call. He requires, of course, a controlled relation between the number of impulses to be selected from the supply and the movement of the lever back to open the circuit, and he gets this by using impedance coils which are

bridged across the alternating current that comes from the generator and serve to actuate a pallet which acts upon an escapement wheel. That in turn allows the coiled spring to bring the lever back to the position where the circuit is opened at exactly the time when the predetermined number of impulses have gone through. For when enough current will have passed through the impedance coils to actuate the pallet sufficiently to let the spring carry the lever back to open the circuit, enough current impulses must have gone through the closed circuit from the same current to put in operation the signaling means at the receiving station. The timed relation is perfect, for the same current from the generator serves to actuate the pallet control of the escapement wheel which regulates the spring driven toothed wheel that carries back the set lever and also to supply the impulses that, so selected, are let out over the main line to the stations. As it makes no difference in its effect on the pallet whether the initial impulse is positive or negative, there need be no poling of the line. As neither claim 8 or 9 is based on receiving selectors, we need not consider why the sent selections cause the bell to ring only at the selected station. The distinctive feature covered by these claims is the timed relation of the pallet controlled escapement wheel to the current impulses sent out, and that is obtained by using impedance coils in the same current circuit from the generator. The selection is made from an unlimited supply of impulses from the same current; each station has a different call number, and, until the number of stations becomes so great that, as a practical matter, they could not be handled together, there is no limit to the signaling system except such inherent limits as may be in the size of the pre-set device which it is feasible to use, for the supply of current cycles from which the selection may be made will continue as long as the operator turns the crank of the generator.

The defendant's signal sending apparatus uses a separate call key at the central station for each way station. Every time a station is called, the key for that station is turned by the operator and then released. This winds a spring which unwinds when the key is released, and in so doing turns an impulse wheel exactly one revolution. Thus the number of impulses sent over the line from the main battery to the signal receiving stations is always the same no matter what station is to be called and is controlled wholly mechanically without any electrical action as in the Hull patent. There are no impe-

dance coils actuating a pallet controlled escapement wheel which causes the toothed wheel whose spring driven movement it holds in fixed relation to count off, in effect, the desired number of current cycles from an unlimited supply. This constant number of impulses is made to affect the receiving selector of the called station and no other by breaking them into three groups each separated by a pause. This is done by having the teeth of the wheel so grouped that the direct current from a battery, which is the source of current supply instead of a hand-cranked generator, will, as the wheel turns, open and close contact switches that cause a pole changer to let the current escape to the main line in alternating impulses divided into groups as the teeth of the wheel are set to group them. Since this is always the sequence that will close the signal circuit at the called station and no other, only that station will be signaled. Thus, contrary to that of the patent in suit, the sending selector of the defendant operates wholly mechanically, selects from a predetermined number of impulses each time, and selects by breaking that number into three groups.

The appellant has argued that the impedance coils are in effect an electric motor; that the spring the defendant uses should be held to be its equivalent, and so infringement has been established. In making such a claim, appellant has apparently overlooked the fact that both parties use a spring motor; that the defendant selects without any electrical action upon it whatever; that Hull controls his spring motor by current through his impedance coils while the defendant does not; and that these two claims are based upon such control. There is sound sense in the appellant's claim that the action of the current through the impedance coils to make the pallet rotate back and forth on its axis in its control of the escapement wheel is equivalent to a spring motor doing the same thing. To that extent the impedance coils may well be an electric motor, but that is far from all the patent requires them to be. The current through them must not only actuate the pallet, but its movement is fixed by the number of impulses that can actuate it before the escapement wheel it controls has allowed the toothed wheel to return the pre-set lever to the position where the circuit is opened to cut off the source of current supply from the generator. This covers the counting off of a different number of impulses for each station from an unlimited supply which is the sine qua non of these claims, and which the defendant does not do at all and so has no

means for doing. The defendant, on the contrary, measures out from a battery the same amount of current for each call, and splits it into sections to give it selective calling effectiveness. Consequently these claims are not infringed.

It was conceded that, in the defendant's system claimed to infringe, the construction and operation of the patents to Field No. 1,343,256 and No. 1,378,943 are used. The first was applied for May 18, 1916, and was issued June 15, 1920. The second was a divisional application filed April 24, 1917, and the patent was issued May 24, 1921. Field was an employee of the defendant and both patents were assigned to it. Previous to the filing of his applications and in May or June, 1914, Hull took his invention to New York in an endeavor to interest the engineers of the American Telephone & Telegraph Company in it. He there demonstrated it to the engineers of the company, who studied it in connection with an engineer of the defendant. The defendant is wholly owned by the telephone company. Hull was called home by illness in his family, and left New York confident in the belief that his apparatus, left there for further study, would be accepted by the telephone company. After sixty days, however, he inquired about it, and was advised that the American Telephone & Telegraph Company was no longer interested. There was some attempt below to show overreaching in this regard, but we see no reason to doubt the correctness of the trial court's conclusions that there was none.

In the bill of costs allowed, an item of $1,080.23 was included for expense incurred in providing simplified drawings for use in making more clear at the trial the drawings of patents having a bearing on the issues. The statute, section 983, R. S. (28 USCA § 830), provides for the allowance of "lawful fees for exemplifications and copies of papers necessarily obtained for use on trials in cases where by law costs are recoverable in favor of the prevailing party. * * *" The trial court, in denying a motion to retax the costs, said: "The exhibits in Western were necessary in order to have the Court understand what may otherwise have been on the record, but what would have been incomprehensible to the inexpert mind. They were not a mere matter of convenience and there is no claim of bad faith or wastefulness in connection with them." That the judge was correct as to their necessity admits of no doubt. The subject-matter of this case is complicated, and so are the patent drawings

in many instances. The allowance of costs was considered at length in Wooster v. Handy (C. C.) 23 F. 49. We do not think adherence to that decision or to Cornelly v. Markwald (C. C.) 24 F. 187, requires disallowance of the item. This expense is in the same category with that for motion pictures and photographs of small cutting tools allowed in Victor Talking Machine Co. v. Starr Piano Co. (C. C. A.) 281 F. 60, 66, and fairly falls within the statute under fees for "copies of papers necessarily obtained for use on trials. * * ' " As was said in the last case, the better practice, and we may now add the safer practice, would be to obtain an order of the trial court before such expense is incurred, but the need was so plain in this case that the allowance without preliminary order will be upheld.

Decree affirmed.