**UNITED STATES v. INTERNATIONAL BUSINESS MACHINES COR-PORATION et al.** *

District Court, S. D. New York.
Dec. 2, 1935.

F. W. H. Adams, United States Atty., of New York City, and John Dickinson, Asst. Atty. Gen. (George P. Alt, Hammond E. Chaffetz, and Howard L. Godfrey, Special Assts. to the Atty. Gen., of counsel), for the United States.

Davies, Auerbach & Cornell, of New York City (Edward Cornell, Drury W. Cooper, and Martin H. Schenck, all of New York City, of counsel), for International Business Machines Corporation.

Herman Shulman and David L. Podell, both of New York City, for Remington Rand, Inc.

*Decree affirmed 56 S. Ct. 701, 80 L. Ed. —.

WOOLSEY, District Judge.

My decision herein is in favor of the petitioner which is entitled to the relief prayed for in the petition in respect of the issue tried before me.

I. The petition was filed on March 26, 1932, and charges against the defendants violations of the Act of Congress of July 2, 1890, 26 Stat. 209, commonly called the Sherman Anti-Trust Act (15 U.S.C.A. §§ 1–7, 15 note), and of section 3 of the Act of Congress of October 15, 1914, commonly known as the Clayton Act (15 U.S.C.A. § 14).

The suit was originally begun by the United States against the International Business Machines Corporation and one of its wholly owned subsidiaries, the Tabulating Machine Company, and the Remington Rand, Inc., and one of its subsidiaries the Remington Rand Business Service, Inc.

Since the answers were filed herein the Tabulating Machine Company has been merged with the International Business Machines Corporation and the Remington Rand Business Service, Inc., has been dissolved. Thus there are left as the only present defendants remaining in the cause, the International Business Machines Corporation, hereinafter called International, and Remington Rand, Inc., hereinafter called Remington.

II. The petition sets forth as Exhibit 1 an agreement made on March 4, 1931, between the Tabulating Machine Company and Remington, which was the basis of the charges against both corporations of violation of the Sherman Anti-Trust Act. On the practices followed pursuant to said agreement are based the charges of the violation of section 3 of the Clayton Act by each defendant.

The several defendants duly filed answers putting in issue these charges.

Initially, therefore, three issues were involved in this cause: First, whether the defendants had jointly violated the Sherman Anti-Trust Act; and, second and third, whether each of the defendants had severally violated section 3 of the Clayton Act.

III. On October 28, 1935, there were three stipulations entered into between the parties:

1. A stipulation severing the issues as between the petitioner and Remington from the issues as between the petitioner and the defendant International and providing for a separate trial of the latter issues;

2. A stipulation of facts on which the severed issue was to be tried; and

3. A stipulation between the petitioner and Remington providing, in effect, that any decree entered against Remington should be identic with the decree which might be entered against International after the trial of the severed issues between the petitioner and International.

These stipulations were all approved by Judge Knox, and the last two stipulations had annexed to them the proposed form of decree to be entered against the stipulating defendant in the event of a decision against International on the severed issues.

The result, therefore, of the situation created by these stipulations is that my decision on the severed issue will control the decree to be entered as between the petitioner and Remington as well as the decree to be entered as between the petitioner and International.

IV. The facts have been stipulated subject to the right of either side to object to the relevancy and materiality of some of the facts so stipulated.

On November 18, 1935, pursuant to the rights so reserved, the petitioner filed objections to the facts regarding patents stated in subdivision M, of paragraph 2 of the stipulation, as well as to copies of Letters Patent which were filed by International with the stipulation in pursuance of said subdivision, on the ground that in a proceeding under section 3 of the Clayton Act the question whether the object leased is patented or unpatented is irrelevant and immaterial. I sustain this objection and hold that there is not any question of patent law, as such, involved in this cause.

So limiting the facts, I find them to be agreed as follows:

1. On or about June, 1934, defendant the Tabulating Machine Company was merged with the defendant International, which acquired all the assets of the Tabulating Machine Company, including all leases of tabulating and related machines, and assumed all the liabilities of the Tabulating Machine Company, including those under its leases of tabulating and related machines.

2. Petitioner has for the past 30 years manufactured a very small number of tabulating machines with which tabulating cards are used, for use in the United States Bureau of Census. These machines are manufactured for petitioner's own use and not for sale. They differ from those manufactured by the defendant and by Remington in that, while they are capable of performing certain of the functions performed by defendant's machines, they do not perform the variety of functions of which defendant's machines are capable.

3. Tabulating machines made by International are electrically operated; those made by Remington are mechanically operated; and both are used to perform tabulating, recording, calculating, and statistical work. Used in connection with such tabulating machines are sorting machines, punches, and tabulating cards. Tabulating cards are small cards, generally printed, and so designed that perforation in them, according to their various locations or relative positions, indicate numerical or other data. Tabulating cards, when inserted in an electrically operated tabulating machine, are moved to a point in the machine where they come in contact with a large number of small electrical brushes. Said brushes, through the perforations in the cards, establish electrical circuits, thus recording, tabulating, adding, computing, or otherwise registering the information denoted by the perforations in the cards. These machines pass the series of perforated cards over the brushes at a speed of approximately 150 cards per minute. Samples of said cards are attached hereto.

In the mechanically operated tabulating machines of Remington, instead of brushes small pins move into the holes in the tabulating cards, this movement, through linkage, causing the recording, tabulating, calculating, etc.

Sorting machines of International are electrically operated and are used to separate, sort, or classify tabulating cards, according to the perforations in them, in order to segregate or classify all or part of the information represented by such perforations. Electrical contact through a particular perforation actuates the sorting machine in accordance with the location of the particular perforation. In the mechanically operated sorting machines of Remington, the movement of a pin into the perforation of a card, through linkage, causes the operation of the machine. The defendant's sorter operates at a speed of approximately 300 to 400 cards a minute.

Punches of International, operated by hand, mechanically, or electrically, are used to make the perforations in the tabulating cards.

4. All tabulating machines operated by holes in cards, and all punching machines and sorting machines used in connection therewith, which are now manufactured and available for commercial use in the United States, are manufactured and leased (except some hand-punching machines are sold) by the defendant or by Remington. They or their predecessors have made and now own substantially all of such tabulating machines which are being used in the United States by numerous business concerns, and by various departments, bureaus, and administrative establishments of petitioner. Approximately 4,303 tabulating machines, 4,106 sorting machines and 8,412 punches owned by International are now in use in the United States. Other than petitioner, the present users of such machines of International total 3,303. International owns and leases approximately 85.7 per cent. of tabulating machines, 86.1 per cent. of such sorting machines, and 81.6 per cent. of such punches now in use in the United States.

5. Because of the increasing volume and complexity of the statistical data which the petitioner and many individuals, partnerships, and corporations are required to assemble, classify, and tabulate, tabulating machines and related sorting and punching machines of defendant and Remington have become and now are a practical business necessity or advantage for the petitioner and for many such individuals, partnerships, and corporations. There are some machines manufactured by others than the defendant and Remington which perform certain of the operations performed by defendant's tabulating machines, but there are no other machines (or combinations of other machines) available capable of performing without the intervention of additional manual operation the variety of functions performed by the tabulating machines of the defendant and Remington. Defendant's tabulating machines are commonly recognized to be superior in many ways to other machines which may be used for some of the same purposes.

6. The following business machines manufactured and sold by others than the defendant in this case and the manner in which they perform may be described as follows:

The Comptometer consists of a machine arranged with a keyboard and the operator in entering the amounts in this machine does so by the depression of the keys on the keyboard. This directly operates the adding wheels. When a number of entries have been made, the total of these entries is shown on the adding wheels and copied off by the operator.

The National Cash Register, 2000 Series Register, comprises a keyboard and a number of individual accumulators or totalizers. Entries are made of amounts by depressing amount keys on the keyboard and classification of entries into any particular totalizer or totalizers is controlled by their keys. The machine also includes listing and recording mechanism for recording on sheets or rolls of paper each of the items entered into the machine. Operation is effected by an electric motor controlled from the keyboard. After a number of entries have been entered, totals may be obtained of the entries into any particular totalizer. The machine may be arranged for debit and credit entries, and bookkeeping balances thereon.

The Burroughs Adding Machine is made in several types, ranging from simple nonlisting adding machines to the more complicated bookkeeping and statement making machines. In its more complicated form, the machine comprises a keyboard which is manipulated, upon which different classes of entries of amounts are made by an operator. The machine can add and subtract these entries, print the detail of the items, and obtain a series of printed totals. Such machines are widely used in various accounting practices.

The McBee Keysort is a hand-operated device for rapidly sorting special cards into various classifications. These cards (which cannot be used in a tabulating machine) are provided with printed information placed upon them in any desired way and these cards are provided with a row of perforations around all of the edges, but spaced from the edge. When a particular classification is to be designated, a card is placed in a punch which notches out the card from the edge to the hole. These cards are then placed in a filing device and by inserting by hand a long pin in the holes corresponding to the one desired classification to be selected and by raising the pin, these cards may be segregated or sorted from the other cards which have not been notched. This system may be utilized in connection with other listing adding machines such as Burroughs, in order to make calculations based upon the segregated data.

The Underwood Elliott Fischer machines are of various types comprising comparatively simple listing adding machines of the ten key type wherein entries are made by depression of keys, amounts listed and totals added up and total results printed on the tape. The more complicated forms of machines comprise a typewriting type of mechanism with which is associated calculating mechanism operated by the numeral keys of the typewriter. These machines are used for preparing statement forms of various sorts, recording lists or classified series of totals.

The Remington machines comprise punching machines, sorting machines, and tabulating machines. These machines in general correspond to those of International, but in these machines action is mechanical, the power alone being supplied through electrical energy.

The Marchant Calculator is a calculating machine provided with a keyboard and an accumulating mechanism, wherein the accumulating mechanism is movable with respect to the keyboard to facilitate multiplication and division. These machines are also capable of operation for a simple addition or subtraction. They are widely used in bookkeeping and statistical work or operations involving addition, subtraction, multiplication, or division. In these machines the operation is wholly controlled by manually operable keys, but actual calculations are effected under power of an electric motor.

The Monroe Calculating machine in its general results is the same as the Marchant Calculator mentioned above.

In none of these machines, other than those of Remington, may a card be inserted therein and information be derived therefrom mechanically or electrically; nor data recorded on cards, by the making of perforations therein, for use with tabulating machines.

None of these machines, other than those of Remington, is capable (as are defendant's machines) of simultaneously segregating or accumulating any desired combination of miscellaneous numerical or other recorded data, and of performing calculating or tabulating functions with such segregated or accumulated data, without the intervention of any further manual key board manipulation.

7. International does not sell (and has not, during the past thirty years, sold), but only leases tabulating machines, including sorting machines and punches used in connection therewith (with the exception of hand-operated punches, as distinguished from mechanically or electrically-operated punches, which said defendant does sell). The lease agreements ordinarily used by said defendant provide that (1) the company reserves title to the machines covered by the agreement; (2) the machine user acquires only the right to possess and a license to use said machines; (3) the machine user shall use in connection with said machines only tabulating cards manufactured by the company; and (4) the machine user shall pay to the company a monthly rental. Said agreements provide that said defendant may forthwith resume possession of said machines if the user shall fail to observe the covenant to purchase tabulating cards for use in connection with said machines exclusively from said defendant.

8. Agreements for the use by petitioner of tabulating machines of International have not in all cases required petitioner to use only tabulating cards manufactured by said defendant, but have sometimes provided that if petitioner shall use in said machines tabulating cards not purchased from or manufactured by said defendant, the monthly rental shall be increased in sums provided for in the various agreements with petitioner. Such increased rental has been approximately 15 per cent. of the rental otherwise fixed in such agreements. The additional sums in the form of rentals heretofore collected by said defendant from petitioner because of the use of cards not manufactured or purchased from said defendant have amounted to many thousands of dollars.

9. International has been for approximately thirty years and now is engaged in the business of manufacturing tabulating cards and in recent years has manufactured approximately three billion such cards annually. Said defendant manufactures 81 per cent. of all such cards manufactured. Of the cards manufactured and sold by said defendant, 28 per cent. constitute 45-column cards, 72 per cent. constitute 80-column cards; and 1.4 per cent. of all cards constitute 80-column cards which have been prepunched, .3 per cent. of all cards constitute 45-column cards which have been prepunched, and 4 per cent. constitute detachable record or stub cards. Except for such cards as are sold prepunched, all cards sold by said defendant are punched by the users. An added charge is made for such prepunching. The 45-column cards are designed for round holes, and the 80-column cards for rectangular holes. The 45-column cards and 90-column cards of Remington are designed for round holes.

10. International sells tabulating cards for use in connection with its machines. Purchasers of tabulating cards acquire title thereto, and the cards do not become again the property of International. International and Remington are the only concerns now engaged in manufacturing and selling tabulating cards in the regular course of business in the United States, but the public printer manufactures and sells tabulating cards to the various departments of the United States Government for use in the government's machines and in machines leased from defendant and Remington.

11. International has earned a substantial profit on the manufacture and sale of tabulating cards, the gross receipts derived from the sale of tabulating cards in the years 1926 to 1935, inclusive, being respectively, as follows:

| | | | |
|---|---|---|---|
| 1926 | $2,613,000. | 1931 | $3,414,000. |
| 1927 | $2,633,000. | 1932 | $2,775,000. |
| 1928 | $2,887,000. | 1933 | $2,841,000. |
| 1929 | $3,595,000. | 1934 | $3,392,000. |
| 1930 | $3,947,000. | 1935 | (9 mo.) $2,850,000. |

12. It is possible for others than defendant to manufacture and sell satisfactory and usable tabulating cards. The manufacture of paper from which tabulating cards are made is not the subject of Letters Patent or secret processes. Defendant does not restrict its paper stock suppliers in its relations with others.

13. Tabulating cards for use in defendant's machines must be of almost pre-

cisely accurate dimensions, and must be free of carbon spots, or slime spots, or irregularities of surface. A carbon spot in a card may cause an erroneous and unintended electrical contact, resulting in an erroneous sorting. The parts of the sorting machine are accurately co-ordinated to the card sizes, subject only to minute tolerances. If the card is not accurate as to size or thickness within its tolerance, or if the perforation is not accurately punched within the dimensions of the card, or if the card contains carbon spots, or slime spots, or irregularities of surface, it may become erroneously sorted and may crumple, and clog the sorting machines.

Likewise, the parts of defendant's tabulating machines are accurately co-ordinated to the card size, subject only to minute tolerances. Each card is pushed down (from large numbers of other cards behind it and from the card immediately behind it and in contact with it) by a metal plate having at the top thereof a ridge of five one-thousandth ($\frac{5}{1000}$) of an inch projection. Each plate operates at a speed of 150 movements per minute. If any card is too thin, the result of the operation of this particular part of the machine may be that two cards will be drawn down and may clog at the next passage. Likewise, if any card is too thick or uneven in thickness, or with an irregular edge, it may crumple and clog the work. All machines may be adjusted for cards of different thicknesses within minute tolerances; but if operated upon cards promiscuously arrayed, some of greater and some of lesser thickness, the machines will not feed the cards or otherwise function.

The card, in order to be properly located in the position it takes in relation to the electrical brushes in such tabulating machine and sorters, must be accurately cut to dimensions; if too large it will clog; if too small or not cut at the proper angle the perforations will not be brought in contact with the proper electrical brushes; if the card contains carbon spots or metallic particles, unintended electrical contact may take place through the carbon spots or particles and register erroneous results. Improper surfacing of card, curl in the card, or slime spots in the card, may clog the operation of the machine or throw off the accuracy of the result.

14. When the card is passed across the electrical contacts its nonconducting character is necessary to prevent electrical contact through all save the perforations, and the operation of the tabulating machine is by virtue of the elimination of all electrical contact save the intended contacts through the perforations. Such electrical contacts through the perforations operate and control the mechanism in the statistical recording.

15. The card is not immediately destroyed in the sorting and other operations, but may be used over and over again, sorted to different perforations upon it, as required, and used with the machines, operating now through this and now through that perforation or series of perforations until worn out, and may then be duplicated, through reproducing machines, for further use. Toughness and smoothness of surface, durability, and stiffness are essential in a card for prolonged use.

16. The machines require for their operation a card especially manufactured. The cards used in tabulating machines have no other use, value, or function, save for use in those machines.

17. There are no cards on the general market manufactured for other purposes which are appropriate for use in defendant's machines.

18. International sells time-recording cards for use upon time recorders made by it and used generally by employers for recording the work hours of employees; also carbon paper, ink, ribbon, and record sheets, and other such supplies for both time recorders and tabulating machines, but makes no restriction or limitation upon its lessees or customers as to preventing them from obtaining such supplies upon a general market.

19. International manufactures its own cards, exercises particular care in the selection of paper stock, tests all paper stock with a speck detector (photographs attached and made a part hereof), which runs all the paper over fine electrical brushes, which, on any contact through the paper, operates cutting or marking machinery to ascertain and eliminate the defective part of the paper. The paper, after being tested, is then cut on machinery especially devised for the purpose and printed on machinery espe-

cially devised and adapted to the purpose.

The arrangement of the lines, figures, and numbers on the card varies with the necessities of different customers or classes of customers so that card design and layout is a service ordinarily furnished by defendant to its customers in relation to the making of the card so that the perforations may be made in the appropriate locations for the segregation of the accounting and statistical data. This card design or layout (a service furnished by defendant which is included in the price of the card) is made upon a large sheet photographically reduced to proper proportions and then photo-engraved upon a printing cylinder.

20. In order to furnish such card design and layout service, International has gone to great expense in the maintenance of a school for the education of its salesmen.

21. During the last thirty years, the intricacy of International's machines, the speed at which they are run, and the functions they perform for lessees have much increased.

International's machines have always used cards of various sizes made of paper; and these cards have always been provided with perforations, have always permitted the closing of electrical circuits through the holes therein so as to cause tabulating, sorting, etc., and have always operated in timed sequence with the machines.

If a hole is either ahead of or behind its proper position (due to inaccuracy in card beyond co-ordinated tolerances of machine), the circuit will be established through the card hole at an instant which is out of time with the circuit breakers of the machine and out of time with other parts which the circuit is to control. This may produce an error in the calculation or operation performed by the machines.

22. Satisfactory paper for the manufacture of tabulating cards is available other than from the source of supply from which defendant obtains the paper used in the manufacture of its tabulating cards. The United States Government Printing Office manufactures tabulating cards which have been found to be satisfactory, employing its own methods and machines and such cards are now being used in large quantities daily in the gov-ernment's machines and in machines leased by the government from the defendant and Remington. Cards manufactured by Remington are mechanically satisfactory for use in the 45-column machines of International, but are not now electrically tested.

23. On August 15, 1927, George H. Carter, then public printer for the United States, made application to the Federal Trade Commission to institute a proceeding against International in respect of the clauses of its leases limiting the lessees •to tabulating cards of its manufacture. After a preliminary investigation and an ex parte hearing, at which only International, the Tabulating Machine Company, and Remington were heard, the Commission declined to issue any complaint.

I have, therefore, as the basis for my decision on the issues submitted to me, the pleadings, the agreed facts as here found relevant, and the inferences which I may properly draw therefrom.

V. Section 3 of the Clayton Act (15 U.S.C.A. § 14), so far as herein applicable, reads, in conveniently paragraphed form, as follows (italics mine):

"It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease * * * machinery * * * whether *patented or unpatented,* for use, * * * within the United States, * * * or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement or understanding that the lessee * * * shall not use or deal in the goods, wares, merchandise, * * * supplies or other commodities of a competitor or competitors of the lessor, * * * where the effect of such lease, * * * or such condition, agreement or understanding may be to *substantially lessen competition* or *tend to create a monopoly* in any line of commerce."

VI. It seems to me that in order successfully to maintain herein a cause of action under section 3 of the Clayton Act against International the petitioner should be required to show: That the leases of International's machines contained such restrictive clauses or covenants as are referred to in said section, commonly called "tying clauses"; that there has been, or, now, but for such "tying clauses," would be, competition in the particular commerce involved; that

the "tying clauses" of this defendant's leases have substantially lessened competition in such commerce; or that said clauses have tended to create a monopoly therein.

In my opinion all these elements have been satisfactorily established by the petitioner in the instant cause.

■ A. Here the presence of the "tying clauses" in the leases is common ground.

Annexed to the stipulation of facts is a typical commercial lease used by International and also a typical lease between International's subsidiary, the Tabulating Machine Company with the United States. Both leases, it should be stated, in order to make the phrasing of the quoted clauses clear, took the form of letters from the lessor, accepted by the lessees.

In the commercial lease, the "tying clause" reads as follows (italics mine):

"In consideration of the rental paid for the machines, together with the purchase of cards from this Corporation and the prices paid therefor, this Corporation hereby gives you a non-assignable license to use the above machines at the place and for the work aforesaid, but such license and any contract based upon the acceptance of this proposition shall be terminated forthwith by any failure to pay when due the aforesaid rental of the machines, *or in case any cards that are not purchased from this Corporation are used in the operation of said machines.* In the event of such termination you agree to pay in addition to the rental already accrued, rental for the machines at the full rate for the remainder of the contract period covered by this agreement."

In the lease with the United States, the "tying clause" reads thus (italics mine):

"In consideration of the rental paid for the machines and conditioned upon the purchase of Tabulating Cards from this Company, as hereinafter specified, and the prices paid therefor, this Company hereby gives you a non-assignable license to use the above named machines at the place and for the work aforesaid, but such license and any contract based upon the acceptance of this proposition may be terminated forthwith by any failure to pay when due the aforesaid rental of the machines, except as hereinafter stated. In the event of such termination you agree to pay in addition to the rental already accrued, rental for the machines at the full rate for the remainder of the first year, or contract period covered by this agreement.

"*The rentals hereinbefore stipulated are based upon the exclusive use, in any or all said machines, of cards purchased from the Tabulating Machine Company. In the event the Government requires the right to use in any of the said machines cards printed at the Government Printing Office, then you agree to pay a fifteen per cent increase in the rental of all leased machines covered by this agreement, such increased rental to commence on the day upon which you first use or punch any government-made cards. In the event you resume the exclusive use of cards purchased from this company, the fifteen per cent increase in rental shall be waived, such waiver commencing with the day upon which you start punching exclusively cards purchased from this company, and continuing so long as cards purchased from us exclusively are so used.*"

■ B. The commerce here involved is the sale of unpatented tabulating cards. This is not inconsiderable, as the stipulation of facts shows, for the International alone makes and sells about three billion cards a year. Almost all the cards are sold unpunched to International's lessees and then punched by each lessee as desired for its particular form of sorting and tabulating.

It seems to me that, when the stipulation of facts is read against the background of the pleadings, which includes the agreement of March 4, 1931, made between the International's wholly owned subsidiary and Remington, it is clear beyond any peradventure that Remington is a competitor of International in the commerce of selling tabulating cards.

That there was and in the absence of illegal agreements there again would be competition at least there between International and Remington is implicit in the agreement of March 4, 1931, which is charged by the petitioner as a violation of the Sherman Anti-Trust Act, and which was canceled by the parties thereto after the commencement of this suit against them. If this were not so there would not be any reason for the provision in that contract, under the caption "Cards," that the parties thereto "sev-

erally agree to use their best and utmost endeavor to promote the sale of their respective cards to their respective users of punching, tabulating and/or sorting machines and not to promote (so far as they may lawfully do so) or to encourage directly or indirectly the sale to their respective lessees of cards manufactured by others."

And further that they "severally agree each for itself that it will not solicit business from any such user of the other party in the United States or Canada for cards, unless such user is a user of machines of both parties."

C. The question next to be determined is whether the maintenance of the "tying clauses" would substantially lessen competition in the sale of tabulating cards, by excluding Remington as well as others from selling any tabulating cards, which it or they might make, to the lessees of International's punching, sorting, and tabulating machines.

Under the provisions of paragraph 2, subdivision W, of the stipulation of facts, I have had the advantage of a demonstration of the machines of International in connection with the argument of counsel therefor. I observed with astonished interest the operation of a battery of International machines—its punch, its sorter and its tabulator, which are complementary to each other by reason of the punched cards. I was shown a skeletonized model of the sorter and what is known as a plate model illustrating the operation of the tabulator. I was shown how the electric connections were made by the cards and I came to realize the necessity for accuracy in the punching of the cards in order that the necessary timing for the operation of the machine can be achieved.

There is no question but that, in a certain sense, as counsel for the defendant has said, the cards which are used in the machines are keyboards to the sorter and the tabulator, and that, owing to the electrical operation of the International's machines, the cards must be approximately instruments of precision in order to ensure the necessary timing in their operation.

The argument of the defendant's counsel, however, seemed to me much to overemphasize the difficulty of making these cards sufficiently accurately to enable them to operate the defendant's machines cor-

rectly. For it is part of the stipulation of facts that the public printer for the United States has made tabulating cards which have been successfully used by the United States in the machines of the defendant, and I do not think that it can fairly be assumed that it would be difficult for commercial competitors of International, especially such a competitor as Remington, with its experience in making tabulating cards for its own machines, successfully to make cards which would be properly tested to prevent unintended electrical contacts and would be accurate enough to operate International's machines.

The defendant has argued that the "tying clauses" in the leases involved a reasonable control of the commerce in cards, because the cards were in effect the keyboards of the defendant's sorter and tabulator, and that the result of any defect in any card might be latent for a long time and lead to great possibilities of loss and annoyance to the lessees, and of difficulty in maintenance to International.

I do not think, however, that the test of whether section 3 of the Clayton Act has been violated can be made to turn on the reasonableness of a "tying clause" from the point of view of the convenience of the lessor, or, indeed, even from the point of view of the convenience of both the lessor and the lessee. The test to be applied must not be limited only to the plane of their interests, but should be what might perhaps be aptly described as a three-dimensional test; for the public must be considered and it must be determined whether the "tying clauses" in question "substantially lessen competition" between the lessor and outsiders as possible sellers to the lessees of the article in question.

Indeed, the more I think about the defendant's argument the more I feel that it is merely an argument ab inconvenienti, which in its essence, stripped of all legal embroideries, could be addressed more effectively by the International's salesmen to International's lessees than by counsel for International to a court.

As to the practical result of a voiding of these "tying clauses," International's fears do not appeal to me. For if there is any real trouble in operation of its machines by its lessees with cards bought of outsiders, it is quite certain,

owing to the relation between the cards and the machines, that, although after the "tying clauses" are voided, there may be at first some disloyalties, these disloyalties will be transitory and the lessees will soon be safe back in the fold again.

I think that it is obvious that even if there are no more than two competitors in a commerce of this kind, and each is allowed to bind the lessees of its machines from purchasing the tabulating cards of the other for use in its leased machines, the competition in tabulating cards would almost certainly be not only substantially lessened but practically extinguished. Whereas, if the "tying clauses" are voided in the leases of both competitors, the lessees of each will at least be able to purchase from either, and thus secure a better article or as good an article for a lower price.

■ D. It seems to me, also, that the maintenance of these "tying clauses" would tend to create a monopoly in the commerce involving tabulating cards, which, in their unpunched form, are admittedly entirely unpatented articles.

The defendant has, of course, a limited monopoly in respect of its machines by reason of the presumptive validity of its patents, though none of them has been adjudicated. To maintain the "tying clauses" would allow the defendant to "tend to create" an actual monopoly beyond its proper patent monopoly, in what should be a free field of commerce. This is clearly denounced by the provisions of section 3 of the Clayton Act in its condemnation of "tying clauses" in connection with leases of patented articles.

With the "tying clauses" removed from the leases of both the International and Remington, it seems to me that there will be a clear field for competition, and for the exercise by the several lessees of the two companies of free judgment in their purchases of tabulating cards. This, the Congress says, is as it should be.

■ VII. Accordingly, as the conclusion of law on the agreed facts, I hold that the "tying clauses" in International's leases are in violation of section 3 of the Clayton Act, and that the petitioner's prayer in respect thereof must be granted.

VIII. This opinion, limiting the agreed facts as I have limited them herein, will constitute the findings of fact and conclusions of law in this cause in respect of the issue which has come on for hearing before me.

An order to this effect may be entered on the usual notice. On account of the severance, I think there should be a separate order in this regard instead of having it included, as is often done, as a provision of the final decree.

As to the final decree, I have the following comments to make:

In spite of the fact that the stipulations seem to provide for the entry of separate decrees in respect of the two remaining defendants, my suggestion is that, because this is a single suit, the better practice would be for a single decree to be entered against them both.

I am quite prepared, however, to hear counsel on this point, if there is any reason why my suggestion is not wise or workable.

There will not be any costs granted to the petitioner.

Settle order above referred to, and the final decree or decrees to be entered herein, on notice, unless the form thereof is agreed.