ADVANCE BUSINESS SYSTEMS & SUPPLY COMPANY, a body corporate of the State of Maryland,

v.

S C M CORPORATION, a body corporate of the State of New York.

Civ. No. 18259.

United States District Court
D. Maryland.
June 20, 1968.

Supplemental Opinion July 11, 1968.

Robert G. Levy, Lawrence F. Rodowsky, Berryl A. Speert, Robert S. Paye, and Frank, Bernstein, Conaway & Goldman, Baltimore, Md., for plaintiff.

William E. Willis, J. Marshall Wellborn, Jr., and Sullivan & Cromwell, New York City, and Arthur W. Machen, Jr., Alan Yarbro, and Venable, Baetjer & Howard, Baltimore, Md., for defendant.

THOMSEN, Chief Judge.

This is a private antitrust action tried before the Court without a jury, in which plaintiff seeks to recover treble damages and other relief for alleged violations by defendant of sections 1 and 2 of the Sherman Act (15 U.S.C.A. §§ 1, 2) and section 3 of the Clayton Act (15 U.S.C.A. § 14).

Defendant (SCM) manufactures and sells many products, including office copying machines which use the electrostatic process described below, and sells paper and other supplies for use in those machines.

Plaintiff is engaged in the distribution and sale in Maryland of paper and other supplies for use in SCM and other office copying machines; it is a franchised dealer for Nashua Corporation (Nashua), which manufactures and distributes such paper and other supplies on a nationwide basis.

Briefly, plaintiff contends that SCM has engaged in various unfair and restrictive practices in unreasonable restraint of trade; has attempted to monopolize interstate trade and commerce in the manufacture, sale and distribution of paper for its electrostatic copying machines; has conspired with its customers, the users of such machines, to monopolize such trade and commerce; has tied-in sales of its electrostatic copying paper and other supplies to its machines, to its service contracts and to its warranties; and at one time tied-in sales of its paper to other necessary supplies.[1]

---

1. Elaborate findings of fact proposed by plaintiff and defendant respectively have been made, modified or rejected. This opinion will state only such facts as are

## Copying Machines

Until recently, the reproduction, duplicating, blueprinting or photostating of documents was usually done by separate business concerns or by specialized units of large organizations. In this decade, however, following the success of the original Xerox copiers, many copying machines designed to produce low-cost copies in relatively small volume have made their appearance, and since 1965 several manufacturers have introduced copier/duplicators, which are much faster than the early copiers.[2]

SCM manufactures and sells under its name and trademark office copying machines which use the electrostatic process under license from Xerox Corporation, the owner of the basic patent.[3] Xerox makes the only copying machines which use the "indirect" electrostatic process.[4] The SCM machines (like those of several other manufacturers) use the "direct" electrostatic process. Light is reflected from the original onto a coated paper which has been electrically charged. The image is formed on the coated paper by a liquid "toner" and the copy is dried in the machine.

In 1962 SCM introduced its first copying machine, Model 33, a desk top model, capable of making only one copy at a time. Model 44, introduced about 1964, is also a desk top model, but can make multiple copies. Models 66 and 88, introduced in 1967, are similar to Models 33 and 44, but faster.[5] In early 1966, SCM commenced distribution of its Model 55, a console machine which, unlike the other SCM models, is capable of copying from three dimensional objects such as pages of books.[6]

## Methods of Distribution

Copying machines are generally available on several bases: (1) purchase from the manufacturer or an authorized distributor; (2) lease, involving a sale by the manufacturer to a leasing concern, and a lease or a conditional sale by the leasing concern to the user; (3) rental from the manufacturer, which may be on: (a) the "machine click" basis, used by Xerox, i. e., a charge for each use of the machine to make a copy, the paper and toner being bought separately from Xerox or others; or (b) the "copy service" basis, used by SCM for its Model 55, i. e., a charge for each use of the ma-

necessary to understand the conclusions. If there is any conflict between the facts stated in this opinion and the rulings on the proposed findings of fact, the facts stated in the opinion are intended to control.

2. In 1967 there were available 59 models by 26 manufacturers or distributors using the electrostatic process; 46 models by 10 manufacturers or distributors using the diazo process; 11 models by 6 manufacturers or distributors using the thermal process; 22 models by 6 manufacturers or distributors using the diffusion transfer process; 5 models by 1 manufacturer using the dual spectrum process; and 4 models by 2 manufacturers or distributors using the dye transfer process.

3. In the electrostatic process, the surface of the original (i. e., the document or other object to be copied) is exposed to light and reflected onto an electrically charged surface. Where the light strikes the electrically charged surface, the electrical charge is dissipated and an invisible latent image is formed. The latent image is exposed to "toner", which clings to the charged areas and forms a visible image. This image is then fused to the copy paper.

4. The Xerox copying machines reflect the light from the original onto an electrically charged drum, where the image is formed by brushing with a powder toner. The image is then transferred to the copy paper, which may be ordinary bond paper, although Xerox recommends its own paper. The paper and dry toner used in Xerox machines cannot be used in SCM copying machines.

5. In all of those copiers the original is fed into the machine, copies are formed, the original is returned and the copies are ejected.

6. The original does not enter the Model 55, but remains on a glass plate on the top of the machine; the entire original image is reflected onto the copy paper at one time rather than through use of a scanning device.

chine, including paper and toner, which are supplied by SCM as needed.

### Competition—Machines

The manufacturers and distributors of office copying machines are in active competition with each other. The competition continues even after one of the manufacturers or distributors has rented or sold a machine to a customer, because the customer can often be persuaded to rent a different type of machine or to trade-in a machine which he owns.

The several machines have various advantages and disadvantages. Xerox has been the leader. SCM has never acquired more than 3 or 4 percent of the office copying business, whether measured by the number of machines sold or rented, or by the total annual number of copies made on the several brands of machines.[7]

### Competition—Paper and Replenisher

The sale of supplies, particularly paper, for use with their copying machines, is an important source of profit to the several manufacturers, often exceeding the profit from the machines themselves.[8]

The copying machines which operate on the direct electrostatic process (SCM, Bruning, Apeco, Dennison and a few others) utilize a specially coated paper. Most of those manufacturers produce or purchase and sell paper, which, although designed particularly for their own machines, may be used with generally satisfactory results in other machines employing the direct electrostatic process.

Several paper manufacturers, including Nashua, also produce coated paper suitable for use in these machines.

The desirable qualities for such paper, including paper for use in SCM machines, are numerous and to some extent antithetical; e. g., for storage and other purposes, the lighter and thinner the paper the better, but if it is too light or thin, it is likely to cause paper jams in the machines. Among the characteristics for which SCM tests paper are thinness, stiffness, tackiness, adhesion and conductivity.[9] All usable papers are the result of some design compromises.

From the time it introduced its first machines until 1967, SCM purchased all the coated paper which it sold.[10] During 1965 and 1966, SCM purchased some paper from Nashua for sale in Canada.

Although some coated paper sold by others has not been suitable for use in SCM machines, the paper manufactured by Nashua and sold by it and by plaintiff has always been at least as suitable as SCM paper for use in SCM machines, and often has been better for many purposes than SCM paper, although for copying certain kinds of originals SCM paper has been better. Nashua paper has been no more likely to cause jams than SCM paper and is not likely to damage the SCM machines because of flakiness or for any other reason.

The solution containing positively charged carbon particles which adhere to the electrostatic copying paper to form a legible image is generally referred to as "replenisher".[11] In 1961 the Micro-

---

7. In 1967 the sheets of paper sold by SCM in relation to total copies produced on all brands of machines using the "direct" electrostatic process was about 13 percent, a figure which has been shrinking for several years. Dennison and Bruning have now passed SCM.

8. The sale of paper for use in SCM and some other copying machines is so profitable that plaintiff and other Nashua dealers can afford to furnish free service to their customers, unless such service is made unreasonably expensive by restrictive or other improper practices on the part of the manufacturer.

9. Paper that lacks the proper conductivity —i. e., which takes a charge in the charging unit or discharges the charge in the exposure unit too quickly or too slowly —will produce unsatisfactory copies.

10. Mostly from Plastic Coating and Crown Zellerbach. In August 1967, SCM began purchasing some base stock, which it coated in its own facilities.

11. Except in the Model 55, replenisher for SCM machines is contained in a plastic cartridge with a valve, which is inserted into the top of a tray containing a petroleum distillate known as "dispersant". The Model 55 is designed to accept the

statics Division of SCM developed a formula for replenisher, which was manufactured for SCM by a contractor until early 1967, when SCM itself began to produce replenisher. Nashua purchases from other suppliers the replenisher which plaintiff sells. That replenisher will not harm SCM machines.

In 1965 SCM sold about 80% of the supplies (paper and replenisher) used in SCM machines; in 1966, including the Model 55, about 75%; and in 1967, about 70%.

### Restrictive Policies and Practices

In 1962, when SCM introduced its first copying machine, it sold its paper and replenisher separately. In late 1963 and early 1964, however, competitive brands of electrostatic copying paper began to appear and to threaten the natural monopoly which SCM had theretofore enjoyed in the sale of paper for its own machines. In early 1964 SCM instituted certain practices, primarily to meet that competition.

*Replenisher.* In February 1964, SCM adopted a policy that replenisher should be purchased only with SCM paper; one cartridge of replenisher was furnished with each 5,000 sheets of paper. Previously SCM had sold replenisher at a price of $1.75 per cartridge. In April 1964 the policy was again changed. Replenisher could be purchased separately at $45.00 per half-pint cartridge or

$85.00 per pint, but was provided without additional charge when SCM paper was purchased. Sometime in 1964 other toners appeared on the market. In March 1965 the price of replenisher was cut in half, to $22.50 per half-pint cartridge, and was reduced to $7.50 per half-pint in the summer of 1967.

*Sale of Machines.* SCM has continually sought to prevent sales of its copiers directly or indirectly to "paper merchants", such as plaintiff, who need them in order to compete more effectively with SCM in the sale of paper for use in SCM machines.[12]

*Parts.* SCM has always supplied or sold parts in connection with SCM service to the owners or renters of machines, but when plaintiff has attempted to purchase parts for use on the SCM machines which it was servicing for its customers it has from time to time been subjected to delays which forced it to purchase several second-hand SCM machines and dismantle them in order to obtain parts, although plaintiff was able to purchase some parts from Nashua.[13] Plaintiff's difficulty in obtaining parts was used as a sales tool by SCM supply salesmen.

*Service.* A customer is given service by SCM without additional charge under SCM's rental and copy service programs. One who purchases a machine from SCM is given free service in accordance with the terms of SCM's guarantees. For customers who have either purchased

same type of replenisher which is packaged in a metal aerosol can with a patented valve. When the valve on the replenisher cartridge is activated, a small measured amount of replenisher is discharged into the dispersant. The dispersant and replenisher are mixed together by a pump and the mixed solution is known as "toner".

12. The paper business was so profitable that competitive dealers have been willing to loan or rent machines at reduced prices in order to obtain a customer's paper business. Competing paper salesmen who furnish service to their customers also need machines to break up for parts, but naturally prefer to purchase used machines for that purpose.

13. From 1962 through 1964, it was the SCM policy to sell parts only to owners of machines who certified that they would not resell the parts. In 1965 the policy was modified; parts in stock in SCM branches were to be used only for repairs by SCM servicemen; other orders were to be sent to Skokie, Illinois. In July 1966, it was announced that any parts in local stocks not needed to take care of SCM's own service requirements could be sold to a customer who executed a certificate of ownership and usage. In December 1966 minimum and maximum limits on orders to be filled from local inventories were established. These policies were not always enforced in Baltimore, and some parts were sold to plaintiff.

their machines or leased them from a leasing company, SCM provides service on either a time-material basis or under a "service agreement". In its service agreement SCM undertakes, on the basis of a single annual charge, to provide an unlimited number of service calls during the duration of the agreement, to make regular inspections, and to replace free of charge all defective parts except drive-motors and lamps.

Before April 15, 1963, the SCM service agreement contained no clause relating to the use of competitive supplies. Immediately after competition developed in the sale of paper, SCM modified its service agreement by adding the following paragraph: "6—This agreement shall not apply to any repairs made necessary by the use in this machine of Microstatic Dispersant, Replenisher and Electrostatic Copy Paper made by other than SCM and not approved by SCM for use in SCM equipment." This clause was added at the insistence of the sales department; the service department did not know whether competitive supplies would cause a service problem. In October 1963, SCM's National Sales Manager wrote its National Service Manager that "we should make the sales department feel that we are cooperating with what weapons we have in terms of a service activity to discourage competitive activity in the paper supply area". In March 1964, the National Sales Manager wrote the Western Zone Director: " * * * However, we absolutely must not, under any conditions, provide service under either a contract or warranty at no charge when competitive supplies are being used. We have to take a very stiff position in this area." The clause in the service agreement was used as a tool to coerce customers to purchase SCM supplies.

In August 1964, SCM adopted a new form of service agreement. In addition to the repairs clause, quoted above, it contained a termination clause which provided: " * * * we must reserve the right to suspend this agreement as to any machine in which other suppliers' paper or other supplies have been used."

It was the policy of SCM in 1965 to suspend the service agreement when competitive supplies were used and to render service on a per call basis at a charge of approximately $8.50 per call.

SCM's present service agreement contains the following clauses:

"8. *Photocopy Equipment.* Because SCM photocopy machines are designed to give excellent performance with SCM photocopy supplies, including Microstatic Dispersant, Replenisher, and Electrostatic Copy Paper, SCM reserves the right to suspend this agreement as to any machine in which other suppliers' paper or other supplies have been used.

"9. *Photocopy Equipment.* This agreement shall not apply to any repairs made necessary by the use in SCM photocopy machines of dispersant, replenisher, electrostatic copy paper or other photocopy supplies made by other than SCM and not approved by SCM for use in SCM equipment."

SCM has never approved any paper, other than paper sold by SCM, for use in SCM machines, despite the fact that the responsible SCM officials know that Nashua paper is safe and as effective as SCM paper for such use.

Since 1965, SCM has not terminated the agreements nor charged customers for repairs unless it could prove that the non-SCM supplies did in fact cause damage. However, since 1965, SCM employees, usually salesmen, but sometimes servicemen, with the knowledge and approval of their superiors, have threatened cancellation of service contracts in Baltimore and elsewhere because of the use of Nashua supplies, and plaintiff has been damaged by such threats in the Baltimore area.

*Rental Agreements.* It was the policy of SCM from at least as early as August 1965 through March 1966 to threaten the cancellation of rental agreements

with customers who use competitive supplies in their SCM machines.[14]

*Model 55.* From the time of its introduction and first sales to the public in the first part of 1966 until March 1967, the Model 55 was available only on the copy service basis.[15] Since the per copy charge includes the cost of the SCM supplies, the copy service plan forecloses competition for such supplies, including paper.

SCM offered testimony that its copy service plan was designed to enable the Model 55 to compete with the Xerox 914, a book copying machine which has been distributed almost entirely on a metered basis.[16] However, the Xerox "meter click" plan does not include supplies in the charge, and it has not been shown that Bruning, Dennison and other manufacturers of machines using the direct electrostatic process include paper in their rental charge.

Since March 1967, largely at the insistence of the purchasing agency of the Federal Government (GSA), SCM has offered to sell its Model 55 copiers, but few have been purchased.[17]

Plaintiff has discovered Model 55's under copy service at eight locations where plaintiff was selling electrostatic supplies, general office supplies or both, but the copy service plan has denied plaintiff the right to compete for the sale of paper to be used in those machines.

*Sabotage and Misrepresentations.* Plaintiff claims that SCM paper salesmen and servicemen have committed various acts of sabotage on the SCM machines of plaintiff's customers who were using Nashua paper and replenisher and have then blamed the Nashua paper for the inability of the machines to produce satisfactory copies. Most of the alleged acts of sabotage were not proved, but the facts set out in the next two paragraphs were proved.

From time to time, SCM's paper salesmen, after having run off a satisfactory copy on SCM paper, set the shutters on the machines in a position where no satisfactory copy could be produced on any paper, ran off an unsatisfactory copy on Nashua paper, and placed the blame for the unsatisfactory copy on the quality of the Nashua paper, deliberately and dishonestly, in an effort to induce the customer by means of such misrepresentation to stop using Nashua paper and to buy SCM paper.[18]

14. The rental agreements permit cancellation on 15 days' written notice by either party.

15. Essentially, the customer pays a single charge on the basis of the number of copies run on the machine as recorded by a meter; supplies and service are included on the single charge. The arrangement is terminable by either party on one month's notice.

16. The Dennison and Bruning book copiers are also distributed on a metered basis.

17. In the ten months after the sales price was first announced, SCM sold approximately 100 Model 55s to commercial users, and approximately 10 Model 55s to the federal government at slightly lower government rates. No Model 55 has been sold in the Baltimore area, although at the time of trial, SCM was negotiating for the sale of the machine with at least one customer in this area.

18. The interior shutter in the Models 33 and 44 electrostatic copying machine regulates the amount of light which is projected upon the charged electrostatic copying paper. The setting of the shutter is controlled by dial on the exterior of the machine which has a setting range from "0" to "10". A higher number setting on the exterior shutter dial lowers the shutter, allows more light to be reflected upon the paper and makes the copy lighter. Conversely, a lower number setting on the exterior shutter dial raises the shutter, allows less light to be reflected upon the paper and makes the copy darker. If the exterior shutter dial is turned from "0" to "10", the interior shutter will move approximately 40 to 45 degrees.

If the interior shutter is moved to a position approximately 40 to 45 degrees below the proper setting, a copy with a mottled gray area in the center will be obtained. The gray area is caused by the shutter's interference with the reflection of the image.

When SCM's paper salesmen and servicemen found that the machines in which Nashua paper was being used were not producing satisfactory copies because of some fault of the machine or because of an accident not caused by the paper or other supplies, they nevertheless blamed the Nashua paper, deliberately and dishonestly, in an effort to induce the customer by means of such misrepresentation to stop using Nashua paper and to buy SCM paper.

### Attempt and Conspiracy to Monopolize

■ As noted above, plaintiff claims that SCM has attempted to monopolize interstate trade and commerce in the manufacture, sale and distribution of paper for its copying machines, and has conspired with its customers, the users of such machines, to monopolize such trade and commerce, in violation of section 2 of the Sherman Act, 15 U.S.C.A. § 2.

These claims require a consideration of the relevant market. Plaintiff claims that the relevant market is the market for paper to be used in SCM machines; indeed, plaintiff claims that the market for such paper in the Baltimore metropolitan area and the sale of such paper to the federal government are separate relevant markets. On the other hand, defendant claims that the relevant market is the entire office copying market, in which 40 manufacturers compete for the sale or rental of machines,[19] and most of those manufacturers and many independent paper companies and distributors compete for the sale of paper to be used in the various machines.

■ In a broad sense, there is keen competition among all those concerns, with Xerox the undoubted leader, and SCM struggling to hold its 3 or 4 percent of the business against an increasing number of competitors. The copying machines of the various manufacturers are reasonably interchangeable, within the meaning of such cases as United

States v. Grinnell Corp., 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); United States v. E. I. Du Pont De Nemours & Co., 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956).

■ SCM possesses no power to monopolize that broad market. Practically, however, certain submarkets must be recognized. Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); United States v. Grinnell Corp., supra.

■ The sale of coated paper for use in the machines which employ the "direct" electrostatic process is such a submarket. In that submarket some manufacturers, e. g. Bruning and Dennison, sell paper for use not only in their own machines but for use in SCM and other brands as well, and a number of paper companies, including Nashua, sell paper throughout the country suitable for use in most if not all of the machines using the "direct" electrostatic process, of whatever manufacturer. SCM has not attempted to monopolize that submarket, and lacks power to make such an attempt; it sells paper only for use in its own machines; it sells less paper than Bruning or Dennison, and is faced with strong and increasing competition both in the sale of machines and in the sale of paper.

When SCM introduced its first machine it had a natural monopoly for a few months of the sale of paper and other supplies for use with that machine. But competition quickly developed for the sale of paper, and by 1965 for replenisher. The evidence shows that SCM has attempted by various means to keep for itself the sale of paper for use in its own machines. If paper for use in SCM machines is a relevant market, which one may attempt to monopolize in violation of section 2 of the Sherman Act, SCM has made such an attempt. But the facts in this case do not show that the relevant market should be defined in such unrealistically narrow terms. The relevant submarket is the sale of coated paper for

19. See note 2, above.

use in SCM and other machines which employ the direct electrostatic process. United States v. E. I. Du Pont De Nemours & Co., 351 U.S. 377, 391–393, 76 S. Ct. 994, 100 L.Ed.2d 1264 (1956); Nelligan v. Ford Motor Co., 262 F.2d 556, 557 (4 Cir. 1959). See also United States v. Grinnell Corp., 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965); Brown Shoe Co. v. United States, 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962).

▇ The Court finds that SCM has not attempted to monopolize any relevant market.

Even if we should assume that a seller may conspire with an ultimate consumer to violate section 2 of the Sherman Act,[20] there was no such conspiracy here.

The Court concludes that no attempt to monopolize or conspiracy to monopolize in violation of section 2 of the Sherman Act has been proved.

*Tie-ins and Contracts in Unreasonable Restraint of Trade*

Even though SCM may not have sufficient power to attempt to monopolize any part of the trade or commerce among the several states, in violation of section 2 of the Sherman Act, it may have sufficient economic power to permit it to use its rental agreements, service agreements, warranties and replenisher as tying products or vehicles to coerce the sale of paper.[21] The question is, whether they were so used, in violation of section

3 of the Clayton Act, 15 U.S.C.A. § 14, or section 1 of the Sherman Act, 15 U.S.C.A. § 1.

▇ Section 3 of the Clayton Act deals only with the tie-in of one commodity to another; it does not deal with the situation where a commodity is tied to a service. Such a tie-in, however, may be an unlawful restraint of trade under section 1 of the Sherman Act. United States v. Jerrold Electronics Corp., 187 F.Supp. 545, 554 (E.D.Pa. 1960), aff'd per curiam, 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961).

Plaintiff contends that SCM: (a) tied-in paper and supplies with the sale of its machines and with the guaranty accompanying the sale; (b) tied-in paper and supplies with the rental of its machines; (c) tied-in paper and supplies with its service agreements; and (d) tied-in paper to toner.

▇ To establish an illegal tying arrangement, plaintiff must show: (1) the forced purchase of one commodity in order to obtain a separate desired commodity or service; (2) possession by the seller of sufficient economic power with respect to the tying product to restrain free competition in the market for the tied product; and (3) that a not insubstantial amount of interstate commerce in the tied product is affected. Northern Pacific Ry. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 81 S.Ct. 623, 5 L. Ed.2d 580 (1961); Times-Picayune Pub. Co. v. United States, 345 U.S. 594,

---

**20.** None of the cases cited in the second paragraph of note 6 in Albrecht v. Herald Company, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968), was a section 2 case, and none involved customers who were ultimate consumers. In *Albrecht*, the subscribers were presumably interested in getting their newspapers as cheaply as possible. In the instant case no reason has been suggested why the purchasers of paper who were cajoled by misrepresentations to stop buying plaintiff's paper and to buy SCM's instead could have become conspirators with SCM, with the attendant liabilities of con-

spirators, when the object of the alleged conspiracy was to force them to give up buying supplies which they preferred.

**21.** Once a customer has purchased or rented an SCM copying machine, he is usually interested in obtaining service from "factory-trained personnel"; if he has purchased the machine he is almost always interested in the warranties; if he is renting the machine, having selected it in preference to others, he is usually interested in continuing the rental arrangement; in any event he must be able to obtain replenisher as well as paper.

73 S.Ct. 872, 97 L.Ed. 1277 (1953); Standard Oil Co. v. United States, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949); United States v. Paramount Pictures, Inc., 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948); United States v. Loew's Inc., 371 U.S. 38, 82 S.Ct. 97, 9 L.Ed.2d 11 (1962); United States v. International Business Machines Co., 13 F.Supp. 11 (S.D.N.Y.1935), aff'd 298 U. S. 131, 56 S.Ct. 701, 80 L.Ed. 1085 (1936); Osborn v. Sinclair Refining Co., 286 F.2d 832 (4 Cir. 1960), cert. den. 366 U.S. 963, 81 S.Ct. 1924, 6 L.Ed.2d 1255 (1961); Dehydrating Processing Co. v. A. O. Smith Corp., 292 F.2d 653 (1 Cir. 1961), cert. den. 368 U.S. 931, 82 S.Ct. 368, 7 L.Ed.2d 194 (1961); Susser v. Carvel Corp., 206 F.Supp. 636 (S.D.N.Y. 1962), aff'd 332 F.2d 505 (2 Cir. 1964), cert. dismissed, 381 U.S. 125, 85 S.Ct. 1364, 14 L.Ed.2d 284 (1965).

The third element exists in this case, even if we consider only the sales in Maryland of paper for use in SCM machines. Defendant disputes the existence of the other two elements with respect to each of the alleged tie-ins.

It is not necessary that a tying arrangement expressly require the buyer to purchase the tied product in order to obtain the tying product or service. The arrangement may be supplemented and enforced by threats or other coercive practices. McElhenny Co. v. Western Auto Supply Co., 269 F.2d 332, 338 (4 Cir. 1959); Osborn v. Sinclair Refining Co., 286 F.2d 832 (4 Cir., 1960), cert. den. 366 U.S. 963, 81 S.Ct. 1924, 6 L. Ed.2d 1255 (1961); United Shoe Machinery Co. v. United States, 258 U.S. 451, 457, 458, 42 S.Ct. 363, 66 L.Ed. 708 (1922); United States v. Loew's, Inc.,

371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962). See also United States v. Arnold, Schwinn & Co., 388 U.S. 365, 382, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967).

*(a) Tie-in of Paper and Supplies to the Sale of Machines and to the Guaranty Accompanying the Sale.* SCM has always offered its desk-top models, 33, 44, 66 and 88, for sale to the public at prices not shown to have been unfair, without any requirement that the purchasers buy or use its paper or other supplies. Nor have any such restrictions been imposed when the copying machine was sold to a leasing company and leased by that company to the customer. When Model 55, the console model, capable of copying pages from a book was introduced in late 1965, it was offered only on a copy service basis, including paper and toner. That arrangement will be discussed in the next paragraph. Model 55 was offered for sale in March 1967, without any requirement that the purchasers buy or use SCM paper or other supplies. There has been no tie-in of paper and supplies to the sale of machines. Nor has plaintiff proved any tie-in of paper and supplies to the guaranty accompanying the sale.[22]

*(b) Tie-in of Paper and Supplies to Machine Rentals. Model 55.* The copy service basis [23]—the only basis on which the Model 55 was supplied until March 1957 and the basis on which it is generally supplied now—involves an illegal tie-in of paper and replenisher to the rental of the machine, unless it can be justified in one or more of the ways suggested by the defendant.

SCM argues first that the copy service agreement consists of the sale of

---

**22.** The SCM guaranty certificate contains the following provision:

"SCM warrants each new SCM Coronastat electrostatic copier to be free from defects in materials or workmanship for a period of 90 days from date of delivery. Any part which proves defective within this period will be replaced without charge. The warranty does not apply: (i) to damage resulting from accident, neglect or misuse, including repairs made necessary by the use of supplies made by any firm other than SCM and not approved by SCM for use in SCM Coronastat electrostatic copiers, or (ii) if the machine is repaired by anyone other than an SCM authorized repairman."

The exceptions are reasonable on their face, and were not shown to have been used coercively.

**23.** See note 15, above.

a single product—copies—for a single unit price, and that in order that there be an illegal tie-in, there must be two distinct products, citing Times-Picayune Pub. Co. v. United States, 345 U.S. 594, at 614, 73 S.Ct. 872, 97 L.Ed. 1277. The facts with respect to the market, discussed above under the heading Attempt and Conspiracy to Monopolize, the fact that Xerox does not include paper in its copy service agreement, and the absence of any proof that Bruning, Dennison and other manufacturers of machines using the direct electrostatic process include paper in their rental charge, show that the rental of machines and the sale of paper are recognized as separate items and not as a single product. See Times-Picayune Pub. Co. v. United States, supra, and United States v. Jerrold Electronics Corp., 187 F.Supp. 545 (E.D.Pa. 1960), aff'd per curiam, 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961), reh. den. 365 U.S. 890, 81 S.Ct. 1026, 6 L.Ed.2d 200.

▮▮▮ SCM then argues that even if the rental of machines and the sale of paper are recognized as separate items, they may be offered as a combination at a unit price, if they are also available separately, and that since March 1967 Model 55 has been available for purchase separately without any requirement that the purchaser buy SCM paper. It has never, however, been available for rental without that requirement, the principal purpose of which is to force the purchase of SCM paper. The Court concludes that the availability of the Model 55 for purchase does not prevent the copy service agreement from being an illegal tying device, in unreasonable restraint of trade, unless and until the Model 55 is also offered for rental on a reasonable basis without the requirement that SCM paper be purchased.

Finally, SCM argues that the copy service arrangement was justified, at least until March 1967, on the ground that the Model 55 was a new product introduced by a small competitor into a field dominated by Xerox, and as such was entitled to the benefit of the new product defense, recognized in United States v. Jerrold Electronics Corp., 187 F.Supp. 545, 556–558 (E.D.Pa.1960), aff'd per curiam, 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961). See also General Talking Pictures Corp. v. American Tel. & Tel. Co., 18 F.Supp. 659 (D.Del. 1937); United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L. Ed.2d 1249 (1967). It is not necessary to pass on this point, because plaintiff has not proved any damage to it with respect to any Model 55 prior to March 1967.

*Other Rental Agreements.* SCM rents its other office copying machines under written rental agreements, which contain no prohibition against a customer using non-SCM paper and supplies. The only paragraph which mentions non-SCM supplies reads as follows:

"User understands that all machines remain the property of SCM and User agrees that (a) the machines will not be altered or serviced by anyone other than an authorized SCM repairman, (b) supplies which may cause damage or deterioration will not be used in the machines, and (c) the machines will not be moved from place of initial installation without receiving prior written approval from SCM."

The quoted clause in the rental agreement is not itself unlawful,[24] but the precise language of the clause in the rental agreement is not controlling if the clause, reinforced by the conduct of the lessor,

24. Standard Oil Co. of Calif. v. United States, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949); Susser v. Carvel Corp., 206 F.Supp. 636 (S.D.N.Y.1962), aff'd 332 F.2d 505 (2 Cir. 1964), cert. dismissed, 381 U.S. 125, 85 S.Ct. 1364, 14 L.Ed.2d 284 (1965); United States v. Jerrold Electronics Corp., 187 F.Supp. 545 (E.D.Pa.1960), aff'd per curiam, 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961).

has been used to coerce lessees.[25] Nashua supplies have been used on some rental machines in plaintiff's market area, and there is no evidence that any rental agreements in that area were terminated because of the customer's use of the Nashua supplies. In 1965 and early 1966 some SCM employees threatened to cancel rentals if Nashua supplies were used. There is no evidence that any such threats were made in Baltimore, but SCM employees in Baltimore have misrepresented the likelihood of damage by the use of such supplies.

*Refusal to Sell Machines to Plaintiff.* The Court has found that SCM has sought to prevent sales of any of its copying machines directly or indirectly by SCM or any of its dealers to "paper merchants", such as plaintiff, in order to prevent such merchants from renting the machines to prospective supply customers, especially those prospective customers who were renting the machines from SCM or its dealers and feared that the SCM rental agreement would be cancelled if they used competing supplies. Plaintiff contends that this policy was intended to aid a tie-in of paper and supplies to the rental of machines by SCM and its dealers, but plaintiff failed to prove that SCM or any of its dealers had refused to sell plaintiff any machines because of that policy. Moreover, during the pre-trial proceedings and throughout the trial plaintiff stated that it was not claiming relief based upon any conspiracy or combination between SCM and its dealers. Accordingly, plaintiff cannot obtain injunctive relief herein against SCM based on any past refusal by SCM or its dealers to sell machines to plaintiff. The Court intimates no opinion whether plaintiff would be entitled to such relief in a future case, and nothing herein is intended to bar any such future case.

*(c) Tie-in of Paper and Supplies with the Service Agreement.* The facts with respect to this tie-in are set out above, under the heading "Restrictive Policies and Practices", subheading "Service". See also the subheadings "Parts" and "Sabotage and Misrepresentations".

Although the provisions of SCM's service agreements, which are quoted above, are not unreasonable on their face, they have been used by SCM's employees to coerce customers to stop using Nashua paper and other supplies sold by plaintiff and to use only SCM paper and supplies, in violation of section 1 of the Sherman Act. SCM employees, usually salesmen, but sometimes servicemen, with the knowledge and approval of their superiors, have threatened cancellation of service contracts in Baltimore and elsewhere because of the use of Nashua supplies, and plaintiff has been damaged by such threats in the Baltimore area. Those threats have been reinforced by the shutter sabotage and the deliberate and dishonest disparagement of plaintiff's product by SCM paper salesmen, as outlined under the subheading "Sabotage and Misrepresentations", above.

The antitrust laws do not require SCM to furnish service at a flat rate under its service agreement when other than SCM supplies are used, provided SCM is willing to furnish service in such cases at a fair rate on a time and material basis. But the antitrust laws do not allow SCM to misrepresent the effect of the agreement or the reasons for malfunctioning of the machines as part of a plan to force customers to abandon the use of competing supplies which do not damage the machines.

*(d) Tie-in of Paper to Toner.* This was done literally during a few months in 1964. Thereafter, toner and paper were offered for sale separately, but the

**25.** McElhenny Co. v. Western Auto Supply Co., 167 F.Supp. 949 (W.D.S.C.1958), aff'd 269 F.2d 332 (4 Cir. 1959); Osborn v. Sinclair Refining Co., 286 F.2d 832 (4 Cir. 1960), cert. den. 366 U.S. 963, 81 S.Ct. 1924, 6 L.Ed.2d 1255 (1961); United Shoe Machinery Corp. v. United States, 258 U.S. 451, 42 S.Ct. 363, 66 L.Ed. 708 (1922); United States v. Richfield Oil Corp., 99 F.Supp. 280 (S.D. Cal.1951); United States v. Loew's, Inc., 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962).

toner was offered at an unreasonably high price, intended to effect a practical continuance of the tie-in. The price has been lowered twice, and plaintiff has not shown that the present price is unreasonable or that plaintiff has been damaged by any continuing tie-in, if one exists.

\*

Each side charges the other with unfair business practices which do not amount to violations of the antitrust laws, but no such practices have been proved which would justify an award of damages or an injunction against either the defendant or the plaintiff in this case, or which would constitute a defense to the claims alleged and proved by plaintiff.

### Damages

Plaintiff has been damaged by SCM's threats to cancel rentals and service agreements if the paper or other supplies sold by plaintiff were used in SCM machines, aggravated by SCM's shutter sabotage, by SCM's deliberate misrepresentations and false disparagement of plaintiff's paper and other supplies, and to a lesser extent by SCM's parts policy.

█ It has been practically impossible for plaintiff to show exactly what sales it lost as a result of SCM's restrictive practices; but the Supreme Court and other federal courts have allowed plaintiffs considerable leeway in proving damages in antitrust cases. Bigelow v. RKO Radio Pictures, 327 U.S. 251, 66 S. Ct. 574, 70 L.Ed. 652 (1946); Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927); Thomsen v. Cayser, 243 U.S. 66, 37 S.Ct. 353, 61 L.Ed. 597 (1917); Chattanooga Foundry & Pipes Works v. City of Atlanta, 203 U.S. 390, 27 S.Ct. 65, 11 L.Ed.2d 241 (1906); Kobe, Inc. v. Dempsey Pump Co., 198 F.2d 416 (10 Cir. 1952), cert. den. 344 U.S. 837, 73 S. Ct. 46, 97 L.Ed. 651 (1952); Richfield Oil Corp v. Karseal Corp., 271 F.2d 709 (9 Cir. 1959). Cf. Glen Cove Co. v. Dickinson Fuel Co., 72 F.2d 885 (4 Cir. 1934).

Plaintiff's loss, measured by lost sales and other recoverable items, would have been much greater but for the aggressiveness and resourcefulness of plaintiff's president, Alan Elkin, who promptly organized a service department and took other steps to mitigate the effect of SCM's practices. Even without the threats of cancellation made by SCM employees, plaintiff would probably have established by early 1967 its own service department to service the machines of its paper customers, SCM and others, but such threats hastened the establishment of plaintiff's service department and cost plaintiff an appreciable amount of money it would not otherwise have spent in the early years of its operation.

Plaintiff claims four items of damage: (1) the cost of maintaining its service department; (2) the time spent by plaintiff's president, Alan Elkin, in servicing and mollifying plaintiff's customers because of SCM's threats and other restrictive practices, which could have been spent in other work profitable to plaintiff; (3) loss of sales; and (4) lost rental on machines "cannibalized" to provide parts used in service to plaintiff's customers.

The prompt organization of plaintiff's service department enabled it to hold customers it would otherwise have lost, and to replace with new customers some of those it did lose because of SCM's restrictive practices.

█ All factors considered, the Court has concluded that the fair measure of damages to plaintiff in this case is the reasonable cost of furnishing service to those customers of plaintiff who purchased paper and other supplies for use in SCM machines, plus the value to plaintiff of Elkins' time spent in offsetting defendant's restrictive practices. The sum of those two items fairly covers plaintiff's actual damages, including the small loss of specific sales which plaintiff proved and the probable loss of some sales of paper for use with the few Model 55 machines proved to have been on copy service in Baltimore. The small amount of damages claimed for lost rental on machines used to provide parts is not

recoverable, because SCM's parts policy did not violate the antitrust laws.

Plaintiff's service department was also used to service other machines besides SCM machines, and plaintiff concedes that a deduction from its total costs should be made each year on that account. The Court finds that plaintiff should recover 90% of the cost of its service department for the year 1965, 75% for the year 1966, and 60% for the year 1967. Allowing most of the wages of one serviceman for three quarters of 1965 and all of 1966 and 1967, half of the clerical expenses claimed, with payroll taxes on both, the auto expense claimed, no rent, but most of the small general overhead claimed, the Court finds the expense of the service department which should be included in plaintiff's damages to be $5,155 for the year 1965, $5,445 for the year 1966, and $4,914 for the year 1967, a total of $15,514.

The time spent by plaintiff's president, Alan Elkin, in servicing and mollifying plaintiff's customers as a result of the threats, sabotage and misrepresentations by SCM employees, found above, which he could have spent in other activities of greater benefit to plaintiff, amounted to 75 hours at $16 per hour, a total of $1,200.

The sum of those two items is $16,714, which should be trebled, making the amount of the award $50,142.

### Other Relief

Plaintiff is also entitled to an injunction against the Model 55 tie-in, and against any further deliberate misrepresentations by SCM employees attributing the cause of malfunctioning of SCM machines to competitive supplies, in an effort to prevent customers from using such competitive supplies.[26]

Finally, plaintiff is entitled to its reasonable attorneys' fees, to be fixed by the Court, after a further hearing.

26. Of course, SCM will not be prevented from proclaiming the virtues of its own supplies or warning against the danger of using, in its machines, supplies which its employees believe in good faith may dam-

### SUPPLEMENTARY OPINION

#### I. Geographical Scope of Injunction.

After the principal opinion in this case was filed, a hearing was held to consider drafts for a final judgment presented by the respective parties, particularly the geographical scope of the injunction to be entered with respect to the distribution by SCM of its Model 55 or any other copying machine on the copy service basis or on any other basis which requires the customer to buy or use SCM supplies. Plaintiff seeks an injunction national in scope. SCM argues that the injunction should be limited to the State of Maryland, the only state where plaintiff is franchised to sell Nashua paper, where almost all of its sales are made, and the only state where it has suffered or is threatened with loss or damage by SCM's violation of the antitrust laws.

Under 15 U.S.C.A. § 26, a corporation is entitled to have injunctive relief "against threatened loss or damage by a violation of the antitrust laws".

The applicable rule was stated by the Supreme Court in United States v. Borden Co., 347 U.S. 514, 518, 74 S.Ct. 703, 706, 98 L.Ed. 903 (1954), as follows:

"Section 15 of the Clayton Act, 15 U.S.C. § 25, charges the United States district attorneys, under supervision of the Attorney General, with the duty of instituting equity proceedings to prevent and restrain violations of certain of the antitrust laws, including price discrimination. Under § 16 of the Act, 15 U.S.C. § 26, a private plaintiff may obtain injunctive relief against such violations only on a showing of 'threatened loss or damage'; and this must be of a sort personal to the plaintiff."

See also Dollac Corp. v. Margon Corp., 164 F.Supp. 41, 65 (D.N.J.1958), aff'd, 275 F.2d 202 (3 Cir. 1960); Revere Cam-

age the machine. International Business Machines Corp. v. United States, 298 U.S. 131, 139, 56 S.Ct. 701, 80 L.Ed. 1085 (1936).

era Co. v. Eastman Kodak Co., 81 F.Supp. 325, 331 (N.D.Ill.1948).

■ A nation-wide injunction is not supported by the facts proved at the trial nor by the authorities plaintiff has cited.

## II. Attorney's Fee

Plaintiff seeks allowance of an attorney's fee for the Baltimore firm which prepared and tried the case, based upon 931 hours of two partners' time at $40 an hour and 1,683 hours of several associates' time at $25 an hour, a total of $79,315, of which plaintiff seeks to recover $60,000.[1]

Defendant does not dispute that plaintiff's attorneys spent the time stated, and does not dispute the reasonableness of the hourly rates, but contends that attorneys' fees must bear "a relationship" to the amount of single damages recovered, are rarely awarded in excess of the single damages allowed, and cannot be allowed for time spent in unsuccessful efforts to obtain recovery or in defending a counterclaim or in seeking an injunction. Defendant also contends that there was "duplicative staffing" with two, three or four lawyers attending depositions and parts of the trial, and that plaintiff received assistance and encouragement from Nashua and its attorneys.

In Noerr Motor Freight, Inc. v. Eastern Railroad Presidents Conference, 166 F.Supp. 163, 168–169 (E.D.Pa.1958), aff'd 273 F.2d 218 (3 Cir. 1959), rev'd on other grounds, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), Judge Clary listed some of the factors which have been considered in setting a reasonable attorney's fee. They include: (1) whether plaintiff's counsel had the benefit of a prior judgment or decree in a case brought by the government, (2) the standing of counsel at the bar —both counsel receiving the award and opposing counsel, (3) time and labor spent, (4) magnitude and complexity of the litigation, (5) responsibility undertaken, (6) the amount recovered, and (7) the knowledge the court has of the conferences, the arguments presented and the work shown by the record to have been done by the plaintiff's attorneys prior to trial. Judge Clary also discussed two other suggested tests: (8) what it would be reasonable for counsel to charge a victorious plaintiff, and (9) what contribution shall be made by the defendant toward the fees of plaintiff's counsel. In Twentieth Century Fox Film Corp. v. Goldwyn, 328 F.2d 190, 221 (9 Cir. 1964), the Court said that while most of the factors listed by Judge Clary are useful as guides, they do not provide a precise yardstick; that while such fees are usually fixed at a level substantially below the amount of actual damages awarded, there are cases in which the fee exceeded, or very nearly equaled the damage award. In the recent case of Volasco Products v. Fry Roofing Co., 346 F.2d 661, 667 (6 Cir. 1965), the Court approved a fee of $50,000 where the actual damages were $25,000, trebled to $75,000.

■ In Osborn v. Sinclair Refining Co., 207 F.Supp. 856, 864 (D.Md.1962), this Court referred to the factors set out in Canon 12 of the Canons of Professional Ethics of the American Bar Association, which should be considered in determining a reasonable fee in the ordinary case.[2]

---

1. Plaintiff also asks an award of $875 for services of out-of-town attorneys, to which defendant has made no objection.

2. Canon 12 reads: "In determining the amount of the fee, it is proper to consider: (1) the time and labor required, the novelty and difficulty of the questions involved and the skill requisite properly to conduct the cause; (2) whether the acceptance of employment in the particular case will preclude the lawyer's appearance for others in cases likely to arise out of the transaction, and in which there is a reasonable expectation that otherwise he would be employed, or will involve the loss of other employment while employed in the particular case or antagonisms with other clients; (3) the customary charges of the Bar for similar services; (4) the amount involved in the controversy and the benefits resulting to the client from the services; (5) the contingency or the certainty of the compensation; and (6) the character of the employment, whether casual or for an

This Court found, however, that Osborn was an unusual case, that the legal principle established by counsel for plaintiff was an important one, and that one of the purposes of private treble damage suits is to prevent the necessity of government civil suits or prosecutions to establish and correct violations of the antitrust laws.[3] In Union Leader Corp. v. Newspapers of New England, Inc., 218 F.Supp. 490 (D.Mass. 1963), Judge Wyzanski questioned "whether the allowance of an attorney's fee in excess of the losses sustained can be justified solely on the basis that 'one of the purposes of private treble damage suits is to prevent the necessity of government civil suits or prosecutions to establish and correct violation of the antitrust laws,' * * * inasmuch as the statute does not allow an attorney's fee for procuring an injunction but allows it only as an item of damage when losses have been proved to have been sustained by the plaintiff." 218 F.Supp. at 492–493. In the case at bar plaintiff proved that it has sustained losses. Moreover, the Supreme Court has recently reiterated the importance of private actions "as a bulwark of antitrust enforcement". Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968), citing Simpson v. Union Oil Co., 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed. 2d 98 (1962), and Kiefer-Stewart v. Joseph E. Seagram & Sons, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951). An award of attorney's fees should be based upon a consideration of all relevant factors, including the importance of private actions in enforcing the antitrust laws.

In this case plaintiff's counsel did not have the benefit of a prior judgment or decree in a case brought by the government. The standing of plaintiff's counsel and of defendant's counsel is very high. It is conceded that plaintiff's counsel spent the large amount of time claimed in the preparation and trial of the case, but there is merit in defendant's contentions that a considerable part of that time was spent in developing issues and items on which plaintiff failed to prevail,[4] and that there was some unnecessary "duplicative staffing". The case was complex and, as noted in the principal opinion, it was only the resourcefulness of plaintiff's president which kept its losses from being much greater. Plaintiff's Baltimore counsel assumed full responsibility for the litigation, and although the amount recovered was not large, compared to many other antitrust cases, the principles established were important to the developement of plaintiff's business. Nashua and its attorneys undoubtedly aided plaintiff and its attorneys in preparing the case, and may have reduced somewhat the hours which would otherwise have been spent by plaintiff's attorneys. Nothing is claimed or awarded herein for services rendered by Nashua's attorneys nor for any services rendered by plaintiff's attorney to Nashua or anyone else except plaintiff.

All factors considered, the Court finds that plaintiff is entitled to recover attorneys' fees in the amount of $35,875.

*III. Costs.*

Plaintiff has filed herein a proposed Bill of Costs in the amount of $8,918.53. Based on his normal practice, the Clerk has proposed to tax costs in the amount

---

established and constant client. No one of these considerations in itself is controlling. They are mere guides in ascertaining the real value of the service."

3. On appeal, the Fourth Circuit awarded certain damages which this Court had found the plaintiff had sustained but was not entitled to recover. The Fourth Circuit did not discuss the method of fix-ing the attorneys' fees; it merely ordered this Court to determine what, if any, additional attorneys' fees should be awarded plaintiff's counsel for their successful prosecution of the second appeal. 324 F.2d 566 (4 Cir. 1963).

4. No considerable amount of time was spent in defending against the counterclaim.

of $397.06, and plaintiff now seeks review of the Clerk's decision.[5]

SCM does not contest the Clerk's decision to tax fees of the Clerk ($15.00), fees of the Marshal ($169.36), witness fees ($80.00) and the docket fee ($20.00). SCM also admits that some allowance is proper for producing copies for three books of exhibits prepared at the request of the Court. All other items are disputed.

■■■ Rule 54(d), F.R.Civ.P., provides generally that "costs shall be allowed as of course to the prevailing party unless the court otherwise directs". Not every expense of litigation is recoverable. The items which "may" be taxed are found in 28 U.S.C. 1920, 1921 and 1923. Witness allowances are covered by section 1821. Section 1920 is set out in note 6,[6] in the margin.

Plaintiff seeks to expand the usual categories of taxable costs in this case because the Clayton Act, designed to encourage private enforcement of the anti-trust laws, allows recovery of "the cost of suit", 15 U.S.C. § 15, whereas Rule 54(d) speaks only of "costs". Plaintiff concedes that no court has accepted its contention. In Twentieth Century Fox Film Corporation v. Goldwyn, 328 F.2d 190, 224 (9 Cir. 1964), the Court held that "the only costs recoverable by a successful plaintiff in a private antitrust suit are those which are naturally allowable under 28 U.S.C. § 1920 and Rule 54(d) * * *." See also Straus v. Victor Talking Machine Co., 297 F. 791, 806 (2 Cir. 1924), and Brookside Theatre Corp. v. Twentieth Century Fox Film Corp., 11 F.R.D. 259, 265 (W.D.Mo.1951).

■■■ On the other hand, a trial court possesses broad discretionary powers in the allowance or disallowance of costs within the categories set out in section 1920. 3 Barron & Holtzoff, Federal Practice and Procedure, sections 1195, 1197 (1958 ed.); 6 Moore, Federal Practice, Par. 54.70[5] (2d ed. 1966). In a private antitrust suit a court should not exercise that discretion niggardly.

■■■ *(a) Daily Copy of Trial Transcript.* Plaintiff seeks to tax $3,289.00, representing one-half of the cost of the Court's copy of the daily trial transcript and the cost of a copy for plaintiff's counsel.

■■■ Sub-section (2) of 28 U.S.C. 1920 provides that a Court may tax as costs: "Fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case." In this District, the Clerk does not ordinarily tax the cost of any transcript except the court's copy, and then only when the transcript has been specifically requested by a judge. The trial judge, however, may tax the cost of the transcript in an appropriate case.

■■■ The general rule is "that stenographic transcripts are often 'necessarily obtained for use in the case' ; and that if they are, rather than a mere luxury or convenience, the trial court in the exercise of a sound discretion *may* tax all reasonable expenses incurred by a prevailing party in obtaining stenographic transcripts both for the Court and himself. This doctrine includes the added expense for a daily transcript when the exigencies of the case warrant; * * *" 6 Moore, Par. 54.77[7], at p. 1375.

---

5. No judgment has yet been entered, but the parties have waived the formal procedures, and have agreed to treat the Clerk's proposed action as being properly reviewable at this time.

6. "§ 1920. Taxation of costs
"A judge or clerk of any court of the United States may tax as costs the following:
"(1) Fees of the clerk and marshal;
"(2) Fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case;
"(3) Fees and disbursements for printing and witnesses;
"(4) Fees for exemplification and copies of papers necessarily obtained for use in the case;
"(5) Docket fees under section 1923 of this title.
"A bill of costs shall be filed in the case and, upon allowance, included in the judgment or decree. June 25, 1948, c. 646, 62 Stat. 955."

In applying this rule, courts have generally considered the length of the trial, the complexity of the issues, whether a daily transcript was necessary to minimize disagreement over the testimony of witnesses, and whether proposed findings of fact were required. See Farmer v. Arabian American Oil Co., 379 U.S. 227, 233, 234, 85 S.Ct. 411, 13 L.Ed.2d 248 (1964); Independent Iron Workers, Inc. v. U. S. Steel Corp., 322 F. 2d 656, 678 (9 Cir. 1963); Brookside Theatre Corp. v. Twentieth Century Fox Film Corp., supra.

In the present case the court reporter approached counsel for plaintiff immediately before the trial, stated that defendant had ordered daily copy, and asked if plaintiff intended to do likewise. Plaintiff's counsel then agreed to order daily copy. The trial lasted four weeks, Court and counsel repeatedly referred to the transcript during the trial, and although the issues were not complex, they were numerous. Moreover, the Court indicated near the outset of the trial that the parties should file proposed findings of fact and follow the "red-blue-yellow" technique.[7] A daily transcript is usually necessary in a nonjury case which lasts more than a week, in which the facts cannot be decided from the bench, and proposed findings and briefs are necessary so that the findings may be made while the testimony is fresh in the judge's mind and the time of counsel as well as of the Court may thus be saved. See Farmer v. Arabian American Oil Co., supra. Certainly, a daily transcript, with a copy for plaintiff's counsel as well as for the Court, was necessary for use in this case.

*(b) Printing Costs.* The Clerk properly held taxable the cost of repro-

ducing the proposed findings of fact required by the Court to be exchanged, and properly disallowed the cost of reproducing plaintiff's briefs. The Clerk allowed the taxable item at too large a figure, since it included a charge for overhead. It should be taxed in the amount of $46.90.

*(c) Witness Expense.* Plaintiff seeks allowance of traveling expenses for three out-of-state witnesses. In each instance the requested mileage allowance exceeds 200 miles.

The rates for mileage and per diem set by 28 U.S.C. § 1821 are 8¢ per mile for travel, $4 for each day's attendance and $8 per day for subsistence. No limitation on allowable mileage is imposed by the statute, but Rule 45(e) limits the effective range of a subpoena to 100 miles from the place of hearing, and before 1964 many decisions established a flat 100-mile limit. See cases cited in 6 Moore, Par. 54.77[5], n. 6, at p. 1363. In Farmer v. Arabian American Oil Co., 379 U.S. 227, 85 S.Ct. 411, 13 L.Ed.2d 248 (1964), the Supreme Court refused to "accept either the extreme position of the company that the old 100-mile rule has no vitality for any purpose or Farmer's argument that a federal district court can never under any circumstances tax as costs expenses for transporting witnesses more than 100 miles". 379 U.S. at 232, 85 S.Ct. at 415. The Court held that the trial judge was correct in treating the case as an appeal to his discretion, and approved his refusal to allow travel expenses for more than 100 miles from the courthouse. The Court said: "That rule, we think, is a proper and necessary consideration in exercising discretion in this field. The century-and-a-half-old special statutory provision

---

7. Under that technique, counsel exchange three copies of the proposed findings of fact several days before oral argument. Defendant then underlines with a red pencil those portions of plaintiff's proposed findings which he disputes, with blue those he admits, and with yellow those he does not dispute but deems irrelevant. He delivers one marked copy to the court and one to the other side.

Plaintiff does the same with defendant's proposed findings. Sometimes an entire proposed finding is underlined in red, sometimes a sentence or only a part of a sentence. At the oral argument counsel discuss all portions underlined in red. This technique points up the argument and saves a great deal of judicial time.

relating to service of subpoenas more than 100 miles from the courthouse is designed not only to protect witnesses from the harassment of long, tiresome trips but also, in line with our national policy, to minimize the costs of litigation, which policy is strongly emphasized in the Federal Rules of Civil Procedure. Here the company on its own, without prior notice to the court, brought its foreign witnesses to court at its own expense." 379 U.S. 234–235, 85 S.Ct. 416.

In the instant case this Court finds no sufficient justification for exceeding the usual limit. In future cases, our Clerk should adhere to the 100-mile rule, leaving it to the trial judge to increase the allowance in his discretion.[8]

■ *(d) Fees for Exemplification and Copies of Papers Necessarily Obtained for Use in the Case.* (1) Plaintiff seeks to recover under this classification $2,335 for fees of accountants who collected and analyzed data of plaintiff's sales, costs and profits, and prepared charts and schedules setting out that data, which were introduced as exhibits at the trial. It is true that the reasonable expense of preparing maps, charts, graphs and kindred materials is taxable under 28 U.S.C. § 1920(4) when necessarily obtained for use in the case. 6 Moore, Par. 54.77[6], at p. 1370. See also, Hansen v. Bradley, 114 F.Supp. 382, 385 (D.Md.1953); Hope Basket Co. v. Product Advancement Corp., 104 F.Supp. 444, 450 (D.Mich.1952). But expert witness fees, particularly accountants' are generally not taxable as costs. Twentieth Century Fox Film Corp. v. Goldwyn (supra, 328 F.2d at pp. 223, 224). The cost of schedules illustrating an accountant's audit has been allowed where they

were necessary to a proper understanding of the issues with respect to the profits. Brookside Theatre Corp. v. Twentieth Century Fox Film Corp., supra. See also Freedman v. Philadelphia Terminals Auction Company, 198 F.Supp. 429, 431 (E.D.Pa.1961).[9] The cost of exhibits which are merely illustrative of or incidental to expert testimony is not taxable. 6 Moore, supra, Par. 54.77[6], p. 1371.

■ In the case at bar the exhibits in question were not requested by the Court, and they were not necessary to an understanding of the case. The cost of preparing them is not taxable.

■ (2) Plaintiff also claims $200 for the attendance of one of its accountants at defendant's audit "on equitable grounds". It was understood between the parties that defendant's accountant would require someone in attendance to orient him with plaintiff's books. One of plaintiff's officers or employees could have done this satisfactorily and in a short time. This item is not taxable.

■ (3) The cost of reproducing documents for authentication, for inclusion in document books, and for introduction at trial is usually recoverable where the copies are necessary for the trial or pretrial. 6 Moore, Par. 54.77 [6], at pp. 1368, 1369. The only copying cost allowed by the Clerk in this case was the charge ($18.90) for producing three books of exhibits prepared at the Court's request. SCM concedes the taxability of this item, but disputes the amount of any charge which includes general office overhead of plaintiff's counsel. Although SCM's objection appears picayune, it is well taken, and the figure will be reduced to $9.95. The Court holds

8. In the *Arabian American Oil* case, the Supreme Court quoted with approval the following statement by Judge Weinfeld: " 'Upon an appropriate motion, the means of obtaining the testimony of the witness would have rested with the Court which, in its discretion, could have imposed conditions with respect to which party initially was to bear the expense and provided for its ultimate taxation in favor of the prevailing party.' 31 F.R.D.

191, 195." 379 U.S. at 235, 85 S.Ct. at 416.

9. The cost of such charts is ordinarily taxable only if their preparation was "necessary in order to have the Court understand what may otherwise have been on the record, but what would have been incomprehensible to the inexpert mind." Appliance Inv. Co. v. Western Eectric Co., 61 F.2d 752, 756 (2 Cir. 1932).

taxable some other copying charges claimed, namely, $115.20 for copies of SOS depositions and exhibits, $11.50 for copies of SOS pleadings, introduced as exhibits at the trial, and $160.00 for the cost of paper and a copy-boy hired by plaintiff for the specific purpose of copying documents produced at the office of SCM's counsel and for preparing books of exhibits, as suggested by the Court. The Court refuses to tax other copying charges claimed, amounting to $232.60. The total allowance for copying is therefore $285.65.

■■■■■ *(e) Deposition Costs.* The taxation of deposition costs is recognized as discretionary. For the past fifteen years our Clerk has followed the principles stated by Judge Chesnut in Hansen v. Bradley, 114 F.Supp. 382, 385, 386 (D.Md.1953), which disallowed the cost of depositions which were not introduced in evidence, despite the fact that they may have been used at trial for impeachment purposes. It is now, however, generally recognized by federal courts that deposition transcripts, when reasonably "necessary for use in the case" are taxable under sub-section (2) of 28 U.S.C. § 1920 as "Fees of the court reporter for * * * stenographic transcript". 4 Moore, Par. 26.36; Peck, Taxation of Costs, 37 F.R.D. 481, 487, 488 (1965).

The Court is satisfied that the time has come to bring the practice in the District of Maryland into line with the majority rule throughout the country. We should consider the extent of actual use of each deposition in cross-examination and otherwise, and whether the taking was reasonably necessary to the party's case in light of the particular situation existing at the time of taking. It is not necessarily fatal to taxation that they were not introduced or otherwise used at the trial. Moore, supra; Peck, supra; Nationwide Auto Appraiser Serv. v. Association of Cas. & S. Co., 41 F.R.D. 76, 77 (W.D.Okla.1966); Independent Iron Works, Inc. v. United States Steel Corp., 322 F.2d 656, 678, 679 (9 Cir. 1963); Modick v. Carvel, 209 F.Supp.

361, 364 (S.D.N.Y.1962); Talbot-Windsor Corp. v. Miller, 32 F.R.D. 18, 19 (D.Mass.1962).

■■■ Five of the depositions were used by plaintiff in the cross-examination of SCM witnesses at the trial, and three of the five were also used in pretrial motions. The cost of those five depositions, $484.70, should be taxed. Five depositions were used. purely for discovery. The cost of those depositions will not be taxed.

■■■■■ Where the party taking a deposition has filed the transcript with the Clerk, the cost of an extra copy is generally deemed to be for the convenience of counsel and not taxable. Peck, supra, 37 F.R.D. at p. 487, although a Court has the power to tax the cost of deposition copies in a proper case. See Independent Iron Workers, Inc. v. United States Steel Corp., supra. Where the original deposition is not filed with the Court until the day of trial, the prevailing party may ordinarily recover the cost of a copy of the deposition. See Cooke v. Universal Pictures Co., Inc., 135 F.Supp. 480 (S.D.N.Y.1955). The cost of a copy has also been allowed where reasonably necessary to control an attempt at impeachment. Hancock v. Albee, 11 F.R.D. 139, 141 (D.Conn.1951).

SCM took the testimony of Alan Elkin (President and General Manager of plaintiff), Mrs. Elkin (Secretary and Office Manager of plaintiff), a serviceman, a salesman, and a man employed by plaintiff in both sales and service. The originals of these transcripts were not filed with the Clerk. Plaintiff's counsel could fairly anticipate that defendant would make a strong effort to impeach the testimony of those witnesses. Defendant's deposition of Alan Elkin extended for 1,086 pages, and represents more than 80% of the costs claimed for copies of defendant's depositions. Those copies were "reasonably necessary" and taxable, because necessary to control the attempted impeachment; they should be taxed in the amount of $520.00, making total deposition costs $1,004.70.

In summary, the following costs will be taxed: Fees of the clerk, $15.00; Fees of the marshal, $169.36; Daily copy of trial transcript, $3,289.00; Printing costs, $46.90; Witness fees, $80.00; Exemplification and copies of papers necessarily obtained for use in the case, $285.65; Docket fee, $20.00; and Deposition costs, $1,004.70. The total taxable costs are therefore $4,910.61.[10]

---

10. The Court adheres to the general principle stated on the last page of Judge Chesnut's opinion in Hansen v. Bradley, as reported in 114 F.Supp. 382, at 387.